UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NANCY FELDMAN, ROBERT GREENAWALT, MIKKI SNYDER-HALL, CORTNEY PADLO, TYLER PADLO, BILL HAKIM, RAYMOND AWAD, DANIELLE GIST, ASHLEY HALL, JENNIFER WILLIAMS, TODD HENNIGAR, EDNA MORENO, ELMA PINEDA, ERIKA PINEDA, MASON SHERMAN, CHRISTOPHER WALCH, DEBORAH WALCH, AARON BRILL, CORY BRILL, RICHARD CHARD, DARIUS DIAZ, RYAN DUCLOS, JASON FERREIRA, JUAN GARZA, BREANA GASCA, RYAN HOLOWESKO, KRISTIANE PAVEK, TRACY RAMOS, SUSAN ROGERS, SEZER SARALAR, MOHAMMAD TARKHAN, DEBRA TAYLOR, REGINALD WOOLSTON, JOSEPH ABOY, DEBORAH ALLEN, ZACHARY CORNELIUS, BENJAMIN GILLER, NICOLE HOOEY, VICTOR HUERTA, CECILIA HUERTA, MELISSA QUINONES, SILVYE SOZA, STEVEN STERN, JONATHAN BROSKEY, ROELIN GERVACIO, JOHN GUY, MICHAEL LOW, DIANE AGNEW, VICTOR BRUNO, JULIEN HAMON, KEITH JOHNSON, FARHAD KHAN, JENNIFER MAUSHART, BRYAN MCDANIEL, ARMANDO ONTIVEROS, CRYSTAL SCHANNON, DAVID SCHANNON, SAMANTHA SILVA, MATTHEW LEDBETTER, JEREMIAH THORNBERRY, AND ROBERT O'NEILL, DMITRY SUKHININ, VOLHA SUKHININ, ANDRE RELIS, RICHARD PFAFF, AYUSH SARAOGI, JUANITA LASKEY, CYNTHIA SLACK, BLAIR MCNAMARA, JEFFREY BOGGS, LARA BOGGS, MISTY ERPELDING, ROBERT DODGE, MICHAEL KONYVKA, DON ARNDT, FRITZ ERICKSON, JAN ERICKSON, RODNY HELA, SEAN SCHERER<br><br>Plaintiffs,<br>vs.<br><br>FCA US, LLC,<br><br>Defendant | § | CASE NO.<br><br>**<u>JURY TRIAL DEMANDED</u>** |

# PLAINTIFFS' COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiffs Nancy Feldman, Robert Greenawalt, Mikki Snyder-Hall, Cortney Padlo, Tyler Padlo, Bill Hakim, Raymond Awad, Danielle Gist, Ashley Hall, Jennifer Williams, Todd Hennigar Edna Moreno, Erika Pineda, Elma Pineda, Mason Sherman, Deborah Walch, Aaron Brill, Cory Brill, Richard Chard, Darius Diaz, Ryan Duclos, Jason Ferreira, Juan Garza, Breana Gasca, Ryan Holowesko, Kristiane Pavek, Tracy Ramos, Susan Rogers, Sezer Saralar, Mohammad Tarkhan, Debra Taylor, Christopher Walch, Reginald Woolston, Joseph Aboy, Deborah Allen, Zachary Cornelius, Benjamin Giller, Nicole Hooey, Victor Huerta, Cecilia Huerta, Melissa Quinones, Silvye Soza, Steven Stern, Jonathan Broskey, Roelin Gervacio, John Guy, Michael Low, Diane Agnew, Victor Bruno, Julien Hamon, Keith Johnson, Farhad Khan, Jennifer Maushart, Bryan McDaniel, Armando Ontiveros, Crystal Schannon, David Schannon, Samantha Silva, Matthew Ledbetter, Jeremiah Thornberry, Roberta O'Neill, Dmitry Sukhinin, Volha Sukhinin, Andre Relis, Richard Pfaff, Ayush Saraogi, Juanita Laskey, Cynthia Slack, Blair McNamara, Jeffrey Boggs, Lara Boggs, Misty Erpelding, Robert Dodge, Michael Konyvka, Don Arndt, Fritz Erickson, Jan Erickson, Rodny Helal and Sean Scherer ("Plaintiffs") file this Complaint complaining of FCA US, LLC and respectfully shows the Court as follows:

## PARTIES

### Maryland Plaintiffs

**Nancy Feldmann**

1. Plaintiff Nancy Feldmann is a citizen and resident of the State of Delaware who purchased a 2021 Jeep Wrangler 4xe, VIN 1C4JJXP63MW750855 (hereinafter, the "Vehicle") on or about April 20, 2024 from Hertich CDJR of Elkton in Carvana in Elkton, Maryland.

Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

2. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

3. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

4. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by

the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

5. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

6. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

7. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

8. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Robert Greenawalt**

9. Plaintiff Robert Greenawalt is a citizen and resident of the State of Delaware who purchased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXR68PW586049 (hereinafter, the "Vehicle") on or about March 15, 2023 from Adams CDJR of Maryland in Aberdeen, Maryland. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

10. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

11. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff

reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

12. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

13. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

14. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect

and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

15. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

16. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Mikki Snyder-Hall**

17. Plaintiff Mikki Snyder-Hall is a citizen and resident of the State of Delaware who purchased a 2021 Jeep Wrangler 4xe, VIN 1C4JJXP61MW642282 (hereinafter, the "Vehicle") on or about July 20, 2023 from Pohanka CDJR of Salisbury in Salisbury, Maryland. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

18. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

19. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

20. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

21. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

22. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

23. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered

overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

24. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letters dated April 17, 2026 and September 23, 2026.

**Arizona Plaintiffs**

**Cortney and Tyler Padlo**

25. Plaintiffs Cortney and Tyler Padlo are citizens and residents of the State of Michigan who purchased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXR62PW700207 (hereinafter, the "Vehicle") on or about July 8, 2025 from Carvana in Tolleson, Arizona. Plaintiffs purchased the vehicle for personal, family or household use. Plaintiffs always used the vehicle in the normal and expected manner.

26. Plaintiffs made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiffs chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiffs relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

27. Prior to Plaintiffs' purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiffs of the Battery Defect or FORM Defect in the Vehicle. Plaintiffs reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiffs reasonably

expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiffs reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiffs reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

28. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiffs and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

29. As a result of the defects, Plaintiffs' Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiffs of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiffs' Vehicle was diminished, Plaintiffs were deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiffs were deprived of the benefits of a PHEV for which Plaintiffs paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiffs to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

30. As a result of the defects, Plaintiffs suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiffs known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery

would be prohibited or that Plaintiffs would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiffs and exposing the Vehicle to the weather and the elements, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiffs had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiffs of the electric range and eMPG that was expected, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it.

31. At the time of the purchase, Plaintiffs were unaware of the defects. Had Plaintiffs known the true facts about the Vehicle, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the defects, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

32. Plaintiffs provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Tennessee Plaintiffs**

**Bill Hakim**

33. Plaintiff Bill Hakim is a citizen and resident of the State of Michigan who purchased a 2021 Jeep Wrangler 4xe, VIN 1C4JJXP66MW766404 (hereinafter, the "Vehicle") on or about October 29, 2021 from Gupton Motors in Springfield Tennessee. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

34. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features

and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

35. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

36. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

37. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the

acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

38. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

39. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

40. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**California Plaintiffs**

**Raymond Awad**

41. Plaintiff Raymond Awad is a citizen and resident of the State of California who leased a new 2023 Jeep Wrangler 4xe, VIN 1C4JJXP60PW524776 (hereinafter, the "Vehicle") on or about November 13, 2022 from Los Angeles Chrysler Dodge Jeep Ram in Los Angeles, Los Angeles County, California. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

42. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

43. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

44. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty

when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

45. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA’s recalls and FCA’s accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle’s electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle’s range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA’s recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

46. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA’s concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle’s electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

47. At the time of the lease, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have

paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

48. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Danielle Gist**

49. Plaintiff Danielle Gist is a citizen and resident of the State of California who purchased a used 2022 Jeep Wrangler 4xe, VIN 1C4JJXP69NW160144 (hereinafter, the "Vehicle") on or about February 22, 2025 from Hunter CJDR in Lancaster, Los Angeles County, California. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

50. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

51. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle

would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

52. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

53. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

54. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the

elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

55. At the time of the purchase, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

56. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Ashley Hall and Jennifer Williams**

57. Plaintiffs Ashley Hall and Jennifer Williams are citizens and residents of the State of Colorado who purchased a used 2021 Jeep Wrangler 4xe, VIN 1C4JJXP63MW810133 (hereinafter, the "Vehicle") on or about March 15, 2022 from Autonation in Encino, Los Angeles County, California. Plaintiffs purchased the vehicle for personal, family or household use. Plaintiffs always used the vehicle in the normal and expected manner.

58. Plaintiffs made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiffs chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiffs relied on FCA's implied warranty that the vehicle,

including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

59. Prior to Plaintiffs' purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiffs of the Battery Defect in the Vehicle. Plaintiffs reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiffs reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

60. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiffs and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

61. As a result of the Battery Defect, Plaintiffs' Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiffs of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiffs' Vehicle was diminished, Plaintiffs were deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiffs were deprived of the benefits of a PHEV for which Plaintiffs paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiffs to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

62. As a result of the Battery Defect, Plaintiffs suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiffs known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiffs would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiffs and exposing the Vehicle to the weather and the elements, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiffs suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

63. At the time of the purchase, Plaintiffs were unaware of the Battery Defect. Had Plaintiffs known the true facts about the Vehicle, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the Battery Defect, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

64. Plaintiffs provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Todd Hennigar**

65. Plaintiff Todd Hennigar is a citizen and resident of the State of California who leased a new 2023 Jeep Wrangler 4xe, VIN 1C4JJXP64PW556467, on or about February 8, 2023 and a new 2022 Jeep Wrangler 4xe, VIN 1C4JJXP6XNW229696, on or about August 27, 2022, both from Van Nuys CDJR in Van Nuys, Los Angeles County, California. Plaintiff leased the vehicles for personal, family or household use. Plaintiff always used the vehicles in the normal and expected manner.

66. Plaintiff made the decision to lease the Vehicles after considering FCA's representations about the vehicles, including their reported electric-only range and eMPG. Plaintiff chose the Vehicles based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicles' alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicles, Plaintiff relied on FCA's implied warranty that the vehicles, including their electric batteries, would be merchantable and fit for their ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

67. Prior to Plaintiff's leases, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicles. Plaintiff reasonably expected that the Vehicles, including their electric batteries, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicles would be capable of being charged without compromising their safety or exposing the Vehicles to a risk of fire. Plaintiff reasonably expected that the Vehicles could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicles would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

68. The Vehicles had less than 100,000 miles and were still covered by the implied warranty when the vehicles were leased by Plaintiff and the Battery Defect existed at that time. Moreover, the Vehicles had less than 100,000 miles and were still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect within a reasonable time

69. As a result of the defects, Plaintiff's Vehicles were subject to FCA Recalls B9A, 95B and 68C. The Battery Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicles' electric batteries. As a result, the range of Plaintiff's Vehicles was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicles suffered, the vehicles' range was diminished, and the eMPG of the Vehicles was greatly reduced. In short, Plaintiff was deprived of the benefits of PHEVs for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicles outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicles to the elements

70. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and did not receive the benefit of the bargain after leasing the Vehicles. Had Plaintiff known that the Vehicles presented a risk of a catastrophic fire, that the use of the Vehicles' electric batteries would be prohibited or that Plaintiff would be forced to park the Vehicles outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicles to the elements, Plaintiff would not have leased the Vehicles or would have paid substantially less for them.

71. At the time of the leases, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicles, Plaintiff would not have leased the Vehicles or would have paid substantially less for them. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicles' acquisition.

72. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**<u>Edna Moreno</u>**

73. Plaintiff Edna Moreno is a citizen and resident of the State of California who purchased a new 2023 Jeep Wrangler 4xe, VIN 1C4JJXR65PW505069 (hereinafter, the "Vehicle") on or about October 2, 2022 from Hunter CJDR in Lancaster, Los Angeles County, California. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

74. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

75. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

76. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty

when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

77. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA’s recalls and FCA’s accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle’s electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle’s range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA’s recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

78. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA’s concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle’s electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

79. At the time of the purchase, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle

or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

80. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**<u>Erika Pineda and Elma Pineda</u>**

81. Plaintiffs Erika Pineda and Elma Pineda are citizens and residents of the State of California who leased a new 2023 Jeep Wrangler 4xe, VIN 1C4JJXN60PW621141 (hereinafter, the "Vehicle") on or about January 8, 2023 from Scott Robinson Chrysler Dodge in Torrance, Los Angeles County, California. Plaintiffs leased the vehicle for personal, family or household use. Plaintiffs always used the vehicle in the normal and expected manner.

82. Plaintiffs made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiffs chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiffs relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

83. Prior to Plaintiffs' lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiffs of the Battery Defect in the Vehicle. Plaintiffs reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiffs reasonably expected that the Vehicle

would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

84. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiffs and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

85. As a result of the Battery Defect, Plaintiffs' Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiffs of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiffs' Vehicle was diminished, Plaintiffs were deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiffs were deprived of the benefits of a PHEV for which Plaintiffs paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiffs to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

86. As a result of the Battery Defect, Plaintiffs suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiffs known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiffs would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiffs and exposing the Vehicle to the weather and the

elements, Plaintiffs would not have leased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiffs suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

87. At the time of the lease, Plaintiffs were unaware of the Battery Defect. Had Plaintiffs known the true facts about the Vehicle, Plaintiffs would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the Battery Defect, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

88. Plaintiffs provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Mason Sherman**

89. Plaintiff Mason Sherman is a citizen and resident of the State of California who leased a new 2023 Jeep Wrangler 4xe, VIN 1C4JJXR69PW562388 (hereinafter, the "Vehicle") on or about April 1, 2023 from Rydell CJDR in San Fernando, Los Angeles County, California. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

90. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle,

including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

91. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

92. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

93. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

94. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

95. At the time of the lease, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

96. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Christopher Walch and Deborah Walch**

97. Plaintiffs Christopher Walch and Deborah Walch are citizens and residents of the State of California who leased a new 2023 Jeep Wrangler 4xe, VIN 1C4JJXR6XPW590474 (hereinafter, the "Vehicle") on or about August 15, 2023 from Glenn E Thomas Dodge Crysler Jeep in Signal Hill, Los Angeles County, California. Plaintiffs leased the vehicle for personal, family or household use. Plaintiffs always used the vehicle in the normal and expected manner.

98. Plaintiffs made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiffs chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiffs relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

99. Prior to Plaintiffs' lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiffs of the Battery Defect in the Vehicle. Plaintiffs reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiffs reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

100. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiffs and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

101. As a result of the Battery Defect, Plaintiffs' Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiffs of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiffs' Vehicle was diminished, Plaintiffs were deprived of the environmental benefits that

were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiffs were deprived of the benefits of a PHEV for which Plaintiffs paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiffs to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

102. As a result of the Battery Defect, Plaintiffs suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiffs known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiffs would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiffs and exposing the Vehicle to the weather and the elements, Plaintiffs would not have leased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiffs suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

103. At the time of the lease, Plaintiffs were unaware of the Battery Defect. Had Plaintiffs known the true facts about the Vehicle, Plaintiffs would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the Battery Defect, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

104. Plaintiffs provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Aaron Brill and Cory Brill**

105. Plaintiffs Aaron Brill and Cory Brill are citizens and residents of the State of California who leased, then purchased, a new 2023 Jeep Wrangler 4xe, VIN 1C4JJXP61PW556166 (hereinafter, the "Vehicle") on or about April 8, 2023 from Lampe Chrysler Dodge Ram in Visalia, California. Plaintiffs leased, then purchased the vehicle for personal, family or household use. Plaintiffs always used the vehicle in the normal and expected manner.

106. Plaintiffs made the decision to lease to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiffs chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing, then purchasing the vehicle, Plaintiffs relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

107. Prior to Plaintiffs' lease to purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiffs of the Battery Defect in the Vehicle. Plaintiffs reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiffs reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

108. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased, then purchased by Plaintiffs and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

109. As a result of the Battery Defect, Plaintiffs' Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiffs of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiffs' Vehicle was diminished, Plaintiffs were deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiffs were deprived of the benefits of a PHEV for which Plaintiffs paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiffs to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

110. As a result of the Battery Defect, Plaintiffs suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after leasing, then purchasing the Vehicle. Had Plaintiffs known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiffs would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiffs and exposing the Vehicle to the weather and the elements, Plaintiffs would not have leased, then purchased the Vehicle or would have

paid substantially less for it. As a result of the Battery Defect, Plaintiffs suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

111. At the time of the lease to purchase, Plaintiffs were unaware of the Battery Defect. Had Plaintiffs known the true facts about the Vehicle, Plaintiffs would not have leased, then purchased the Vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the Battery Defect, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

112. Plaintiffs provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Richard Chard**

113. Plaintiff Richard Chard is a citizen and resident of the State of California who purchased a new 2023 Jeep Wrangler 4xe, VIN 1C4JJXN66PW591921 (hereinafter, the "Vehicle") on or about February 20, 2023 from Santa Maria CDJR in Santa Maria, California. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

114. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle,

including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

115. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

116. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

117. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

118. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

119. At the time of the purchase, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

120. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Darius Diaz**

121. Plaintiff Darius Diaz is a citizen and resident of the State of California who purchased a used 2021 Jeep Wrangler 4xe, VIN 1C4JJXP64MW732297 (hereinafter, the "Vehicle") on or about March 22, 2025 from Catalano Motors in Dana Point, California. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

122. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

123. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

124. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

125. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that

were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

126. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

127. At the time of the purchase, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

128. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated May 13, 2026.

**Ryan Duclos**

129. Plaintiff Ryan Duclos is a citizen and resident of the State of California who leased a new 2023 Jeep Wrangler 4xe, VIN 1C4JJXP6XPW553833 (hereinafter, the "Vehicle") on or about June 16, 2023 from Mullahey Chrysler Dodge Jeep Ram in Paso Robles, California. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

130. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

131. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

132. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty

when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

133. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

134. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

135. At the time of the lease, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have

paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

136. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Jason Ferreira**

137. Plaintiff Jason Ferreira is a citizen and resident of the State of California who purchased a new 2023 Jeep Wrangler 4xe, VIN 1C4JJXR69PW586318 (hereinafter, the "Vehicle") on or about December 26, 2023 from Lampe Dodge Chrysler Jeep in Visalia, California. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

138. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

139. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle

would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

140. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

141. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

142. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the

elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

143. At the time of the purchase, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

144. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated June 26, 2026.

**Juan Garza**

145. Plaintiff Juan Garza is a citizen and resident of the State of California who purchased a used 2023 Jeep Wrangler 4xe, VIN 1C4JJXN61PW628910 (hereinafter, the "Vehicle") on or about May 24, 2025 from Avis Car Sales Vista in Vista, California. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

146. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle,

including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

147. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

148. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

149. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

150. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

151. At the time of the purchase, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

152. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**<u>Breana Gasca</u>**

153. Plaintiff Breana Gasca is a citizen and resident of the State of Washington who leased a new 2022 Jeep Wrangler 4xe, VIN 1C4JJXP6XNW206256 (hereinafter, the "Vehicle") on or about July 7, 2022 from Moss Bros CDJR Moreno Valley in Moreno Valley, California. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

154. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

155. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

156. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

157. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that

were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

158. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

159. At the time of the lease, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

160. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Ryan Holowesko**

161. Plaintiff Ryan Holowesko is a citizen and resident of the State of California who purchased a used 2021 Jeep Wrangler 4xe, VIN 1C4JJXP66MW839805 (hereinafter, the “Vehicle”) on or about July 12, 2024 from Simi Valley CJDR in Simi Valley, California. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

162. Plaintiff made the decision to purchase the Vehicle after considering FCA’s representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle’s represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle’s alleged utility and FCA’s reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA’s implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

163. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA’s specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

164. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty

when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

165. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

166. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

167. At the time of the purchase, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle

or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

168. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Kristiane Pavek**

169. Plaintiff Kristiane Pavek is a citizen and resident of the State of California who purchased a used 2021 Jeep Wrangler 4xe, VIN 1C4JJXP60MW758086 (hereinafter, the "Vehicle") on or about June 5, 2022 from Aaron CDJR in Norco, California. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

170. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

171. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle

would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

172. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

173. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA’s recalls and FCA’s accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle’s electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle’s range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA’s recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

174. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA’s concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle’s electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the

elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

175. At the time of the purchase, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

176. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Tracy Ramos**

177. Plaintiff Tracy Ramos is a citizen and resident of the State of Illinois who leased a new 2022 Jeep Wrangler 4xe, VIN 1C4JJXP68NW171622 (hereinafter, the "Vehicle") on or about May 19, 2022 from Moss Bros CDJR in Riverside, California. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

178. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle,

including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

179. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

180. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

181. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

182. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

183. At the time of the lease, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

184. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Susan Rogers**

185. Plaintiff Susan Rogers is a citizen and resident of the State of California who purchased a used 2021 Jeep Wrangler 4xe, VIN 1C4JJXR61MW850255 (hereinafter, the "Vehicle") on or about July 13, 2025 from Huntington Beach Chrysler Jeep Dodge Ram in Huntington Beach, California. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

186. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

187. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

188. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

189. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that

were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

190. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

191. At the time of the purchase, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

192. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated June 26, 2026.

**Sezer Saralar**

193. Plaintiff Sezer Saralar is a citizen and resident of the State of California who purchased a used 2022 Jeep Wrangler 4xe, VIN 1C4JJXR61NW233424 (hereinafter, the "Vehicle") on or about December 15, 2024 from West Coast Auto Sales in Montclair, California. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

194. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

195. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

196. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty

when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

197. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

198. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

199. At the time of the purchase, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle

or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

200. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Mohammad Tarkhan**

201. Plaintiff Mohammad Tarkhan is a citizen and resident of the State of California who leased a new 2023 Jeep Wrangler 4xe, VIN 1C4JJXP64PW553620 (hereinafter, the "Vehicle") on or about April 1, 2023 from Aaron CDJR in Norco, California. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

202. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

203. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle

would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

204. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

205. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

206. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff

would not have leased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

207. At the time of the lease, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

208. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Debra Taylor**

209. Plaintiff Debra Taylor is a citizen and resident of the State of California who purchased a used 2022 Jeep Wrangler 4xe, VIN 1C4JJXP68NW250174 (hereinafter, the "Vehicle") on or about January 29, 2026 from California Motors Direct in Santa Ana, California. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

210. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle,

including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

211. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

212. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

213. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

214. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

215. At the time of the purchase, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

216. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated August 27, 2026.

**Reginald Woolston**

217. Plaintiff Reginald Woolston is a citizen and resident of the State of California who purchased a used 2023 Jeep Wrangler 4xe, VIN 1C4JJXR60PW646261 (hereinafter, the "Vehicle") on or about May 29, 2025 from Mitsubishi of Bakersfield in Bakersfield, California. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

218. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

219. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

220. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

221. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that

were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

222. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

223. At the time of the purchase, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

224. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Joseph Aboy**

225. Plaintiff Joseph Aboy is a citizen and resident of the State of California who purchased a new 2022 Jeep Wrangler 4xe, VIN 1C4JJXR68NW264511 (hereinafter, the "Vehicle") on or about July 18, 2022 from San Diego Chrysler Dodge Jeep Ram in San Diego, San Diego County, California. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

226. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

227. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

228. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty

when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

229. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

230. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

231. At the time of the purchase, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle

or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

232. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Deborah Allen**

233. Plaintiff Deborah Allen is a citizen and resident of the State of California who purchased a used 2021 Jeep Wrangler 4xe, VIN 1C4JJXR62MW861507 (hereinafter, the "Vehicle") on or about March 5, 2025 from Carvana in Escondido, San Diego County, California. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

234. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

235. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle

would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

236. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

237. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

238. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the

elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

239. At the time of the purchase, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

240. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated May 21, 2026.

**Zachary Cornelius**

241. Plaintiff Zachary Cornelius is a citizen and resident of the State of California who purchased a used 2022 Jeep Wrangler 4xe, VIN 1C4JJXP65NW106615 (hereinafter, the "Vehicle") on or about June 7, 2025 from Kearney Mesa CDJR in San Diego, San Diego County, California. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

242. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle,

including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

243. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

244. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

245. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

246. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

247. At the time of the purchase, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

248. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Benjamin Giller**

249. Plaintiff Benjamin Giller is a citizen and resident of the State of California who purchased a used 2021 Jeep Wrangler 4xe, VIN 1C4JJXP61MW770182 (hereinafter, the "Vehicle") on or about February 14, 2025 from San Diego Chrysler Dodge Jeep Ram in San Diego, San Diego County, California. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

250. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

251. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

252. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

253. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that

were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

254. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

255. At the time of the purchase, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

256. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Nicole Hooey**

257. Plaintiff Nicole Hooey is a citizen and resident of the State of California who purchased a used 2023 Jeep Wrangler 4xe, VIN 1C4JJXN6XPW702874 (hereinafter, the "Vehicle") on or about December 23, 2025 from Mazda of El Cajon in El Cajon, San Diego County, California. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

258. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

259. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

260. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty

when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

261. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

262. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

263. At the time of the purchase, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle

or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

264. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026 and May 6, 2026.

**Victor and Cecilia Huerta**

265. Plaintiffs Victor Huerta and Cecilia Huerta are citizens and residents of the State of California who leased a new 2023 Jeep Wrangler 4xe, VIN 1C4JJXP65PW556588 (hereinafter, the "Vehicle") on or about May 1, 2023 from Perry Chrysler Jeep and Dodge in National City, San Diego County, California. Plaintiffs leased the vehicle for personal, family or household use. Plaintiffs always used the vehicle in the normal and expected manner.

266. Plaintiffs made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiffs chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiffs relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

267. Prior to Plaintiffs' lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiffs of the Battery Defect in the Vehicle. Plaintiffs reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiffs reasonably expected that the Vehicle

would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

268. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiffs and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

269. As a result of the Battery Defect, Plaintiffs' Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiffs of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiffs' Vehicle was diminished, Plaintiffs were deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiffs were deprived of the benefits of a PHEV for which Plaintiffs paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiffs to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

270. As a result of the Battery Defect, Plaintiffs suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiffs known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiffs would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiffs and exposing the Vehicle to the weather and the

elements, Plaintiffs would not have leased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiffs suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

271. At the time of the lease, Plaintiffs were unaware of the Battery Defect. Had Plaintiffs known the true facts about the Vehicle, Plaintiffs would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the Battery Defect, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

272. Plaintiffs provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Melissa Quinones**

273. Plaintiff Melissa Quinones is a citizen and resident of the State of California who purchased a new 2023 Jeep Wrangler 4xe, VIN 1C4JJXP66PW556101 (hereinafter, the "Vehicle") on or about January 1, 2023 from Kearney Mesa CDJR in San Diego, San Diego County, California. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

274. Plaintiff made the decision to lease to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing, then purchasing the vehicle, Plaintiff relied on FCA's implied

warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

275. Prior to Plaintiff's lease to purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

276. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased, then purchased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

277. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

278. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after leasing, then purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased, then purchased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

279. At the time of the lease to purchase, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased, then purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

280. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Silvye Soza**

281. Plaintiff Silvye Soza is a citizen and resident of the State of Illinois who leased, then purchased a new 2023 Jeep Wrangler 4xe, VIN 1C4JJXP67PW690390 (hereinafter, the "Vehicle") on or about July 30, 2023 from San Diego Chrysler Dodge Jeep Ram in San Diego, San Diego County, California. Plaintiff leased, then purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

282. Plaintiff made the decision to lease to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing, then purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

283. Prior to Plaintiff's lease to purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

284. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased, then purchased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

285. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that

were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

286. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after leasing, then purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased, then purchased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

287. At the time of the lease to purchase, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased, then purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

288. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Steven Stern**

289. Plaintiff Steven Stern is a citizen and resident of the State of California who leased a new 2023 Jeep Wrangler 4xe, VIN 1C4JJXN60PW684868 (hereinafter, the "Vehicle") on or about June 4, 2023 from Autonation Carlsbad in Carlsbad, San Diego County, California. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

290. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

291. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

292. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty

when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

293. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

294. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

295. At the time of the lease, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have

paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

296. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Jonathan Broskey**

297. Plaintiff Jonathan Broskey is a citizen and resident of the State of California who leased a new 2021 Jeep Wrangler 4xe, VIN 1C4JJXP60MW708160 (hereinafter, the "Vehicle") on or about May 10, 2021 from Stoneridge CDJR in Pleasanton, Alameda County, California. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

298. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

299. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle

would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

300. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

301. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

302. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff

would not have leased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

303. At the time of the lease, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

304. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Roelin Gervacio**

305. Plaintiff Roelin Gervacio is a citizen and resident of the State of California who purchased a new 2023 Jeep Wrangler 4xe, VIN 1C4JJXN62PW684452 (hereinafter, the "Vehicle") on or about June 16, 2025 from San Leandro Chrysler Dodge Jeep RAM in San Leandro, Alameda County, California. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

306. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle,

including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

307. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

308. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

309. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

310. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

311. At the time of the purchase, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

312. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**John Guy**

313. Plaintiff John Guy is a citizen and resident of the State of California who purchased a used 2023 Jeep Wrangler 4xe, VIN 1C4JJXP64PW529379 (hereinafter, the "Vehicle") in May 2023 from AutoNation Toyota Hayward in Hayward, Alameda County, California. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

314. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

315. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

316. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

317. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that

were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

318. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

319. At the time of the purchase, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

320. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated August 27, 2026.

**Michael Low**

321. Plaintiff Michael Low is a citizen and resident of the State of California who purchased a used 2021 Jeep Wrangler 4xe, VIN 1C4JJXP64MW720246 (hereinafter, the "Vehicle") on or about April 27, 2025 from Stoneridge Chrysler Jeep Dodge in Pleasanton, Alameda County, California. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

322. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

323. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

324. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty

when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

325. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

326. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

327. At the time of the purchase, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle

or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

328. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated August 12, 2026.

**Diane Agnew**

329. Plaintiff Diane Agnew is a citizen and resident of the State of California who purchased a used 2021 Jeep Wrangler 4xe, VIN 1C4JJXR63MW751839 (hereinafter, the "Vehicle") on or about March 1, 2024 from Walnut Creek Chrysler Jeep Dodge Ram in Walnut Creek, California. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

330. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

331. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle

would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

332. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

333. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

334. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the

elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

335. At the time of the purchase, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

336. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated August 12, 2026.

**Victor Bruno**

337. Plaintiff Victor Bruno is a citizen and resident of the State of California who leased a new 2023 Jeep Wrangler 4xe, VIN 1C4JJXN61PW611055 (hereinafter, the "Vehicle") on or about January 28, 2024 from Autoworld in Petaluma, California. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

338. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle,

including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

339. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA’s specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

340. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

341. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA’s recalls and FCA’s accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle’s electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle’s range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA’s recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

342. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

343. At the time of the lease, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

344. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated August 12, 2026.

**Julien Hamon**

345. Plaintiff Julien Hamon is a citizen and resident of the State of California who leased a 2022 Jeep Wrangler 4xe, VIN 1C4JJXP6XNW102964 (hereinafter, the "Vehicle") on or about July 31, 2022 from Future CDJR of Concord in Concord, California. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

346. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

347. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

348. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

349. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that

were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

350. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

351. At the time of the lease, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

352. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Keith Johnson**

353. Plaintiff Keith Johnson is a citizen and resident of the State of Florida who purchased a used 2022 Jeep Wrangler 4xe, VIN 1C4JJXR67NW275631 (hereinafter, the "Vehicle") on or about December 4, 2024 from Silveira GMC in Healdsburg, California. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

354. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

355. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

356. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty

when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

357. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

358. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

359. At the time of the purchase, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle

or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

360. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Farhad Khan**

361. Plaintiff Farhad Khan is a citizen and resident of the State of California who purchased a new 2023 Jeep Wrangler 4xe, VIN 1C4JJXP60PW512997 (hereinafter, the "Vehicle") on or about May 29, 2023 from Gilroy Motors, Inc. in Gilroy, California. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

362. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

363. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle

would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

364. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

365. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA’s recalls and FCA’s accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle’s electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle’s range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA’s recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

366. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA’s concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle’s electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the

elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

367. At the time of the purchase, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

368. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Jennifer Maushart**

369. Plaintiff Jennifer Maushart is a citizen and resident of the State of California who leased a new 2022 Jeep Wrangler 4xe, VIN 1C4JJXP69NW171368 (hereinafter, the "Vehicle") on or about July 23, 2022 from Folsom CJDR in Folsom, California. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

370. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle,

including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

371. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

372. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

373. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

374. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

375. At the time of the lease, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

376. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Bryan McDaniel**

377. Plaintiff Bryan McDaniel is a citizen and resident of the State of California who purchased a used 2022 Jeep Wrangler 4xe, VIN 1C4JJXR60NW111749 (hereinafter, the "Vehicle") in May 2025 from Roberts Auto Sales in Modesto, California. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

378. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

379. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

380. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

381. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that

were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

382. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

383. At the time of the purchase, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

384. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated August 27, 2026.

**Amanda Ontiveros**

385. Plaintiff Armando Ontiveros is a citizen and resident of the State of California who purchased a used 2023 Jeep Wrangler 4xe, VIN 1C4JJXR68PW512940 (hereinafter, the "Vehicle") on or about September 11, 2025 from Carvana in San Jose, California. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

386. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

387. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

388. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty

when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

389. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

390. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

391. At the time of the purchase, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle

or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

392. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Crystal Schannon and David Schannon**

393. Plaintiffs Crystal Schannon and David Schannon are citizens and residents of the State of California who purchased a new 2023 Jeep Wrangler 4xe, VIN 1C4JJXR66PW516016 (hereinafter, the "Vehicle") on or about May 31, 2023 from Michael Stead's Walnut Creek Chrysler Jeep Dodge in Walnut Creek, California. Plaintiffs purchased the vehicle for personal, family or household use. Plaintiffs always used the vehicle in the normal and expected manner.

394. Plaintiffs made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiffs chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiffs relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

395. Prior to Plaintiffs' purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiffs of the Battery Defect in the Vehicle. Plaintiffs reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiffs reasonably expected that the Vehicle

would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

396. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiffs and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

397. As a result of the Battery Defect, Plaintiffs' Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiffs of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiffs' Vehicle was diminished, Plaintiffs were deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiffs were deprived of the benefits of a PHEV for which Plaintiffs paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiffs to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

398. As a result of the Battery Defect, Plaintiffs suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiffs known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiffs would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiffs and exposing the Vehicle to the weather and the

elements, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiffs suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

399. At the time of the purchase, Plaintiffs were unaware of the Battery Defect. Had Plaintiffs known the true facts about the Vehicle, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the Battery Defect, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

400. Plaintiffs provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Samantha Silva and Matthew Ledbetter**

401. Plaintiffs Samantha Silva and Matthew Ledbetter are citizens and residents of the State of North Carolina who purchased a used 2021 Jeep Wrangler 4xe, VIN 1C4JJXP65MW716898 (hereinafter, the "Vehicle") on or about April 29, 2024 from Roseville Toyota in Roseville, California. Plaintiffs purchased the vehicle for personal, family or household use. Plaintiffs always used the vehicle in the normal and expected manner.

402. Plaintiffs made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiffs chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiffs relied on FCA's implied warranty that the vehicle,

including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

403. Prior to Plaintiffs' purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiffs of the Battery Defect in the Vehicle. Plaintiffs reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiffs reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

404. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiffs and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

405. As a result of the Battery Defect, Plaintiffs' Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiffs of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiffs' Vehicle was diminished, Plaintiffs were deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiffs were deprived of the benefits of a PHEV for which Plaintiffs paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiffs to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

406. As a result of the Battery Defect, Plaintiffs suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiffs known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiffs would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiffs and exposing the Vehicle to the weather and the elements, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiffs suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

407. At the time of the purchase, Plaintiffs were unaware of the Battery Defect. Had Plaintiffs known the true facts about the Vehicle, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the Battery Defect, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

408. Plaintiffs provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Jermiah Thornberry**

409. Plaintiff Jeremiah Thornberry is a citizen and resident of the State of California who purchased a used 2022 Jeep Wrangler 4xe, VIN 1C4JJXP67NW275972 (hereinafter, the "Vehicle") on or about August 1, 2023 from Roberts Auto Sales in Modesto, California. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

410. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

411. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

412. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

413. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that

were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

414. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

415. At the time of the purchase, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

416. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**<u>Roberta O’Neill</u>**

417. Plaintiff Roberta O’Neill is a citizen and resident of the State of California who purchased a used 2022 Jeep Wrangler 4xe, VIN 1C4JJXP67NW125585 (hereinafter, the “Vehicle”) on or about May 7, 2025 from Norm Reeves Honda in Vista, California. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

418. Plaintiff made the decision to purchase the Vehicle after considering FCA’s representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle’s represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle’s alleged utility and FCA’s reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA’s implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

419. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA’s specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

420. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty

when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

421. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

422. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

423. At the time of the purchase, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle

or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

424. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated August 12, 2026.

**Dmitry and Volha Sukhinin**

425. Plaintiffs Dmitry and Volha Sukhinin are citizens and residents of the State of California who purchased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXP65PW605031 (hereinafter, the "Vehicle") on or about May 7, 2023 from Huntington Beach CDJR in Huntington Beach, California. Plaintiffs purchased the vehicle for personal, family or household use. Plaintiffs always used the vehicle in the normal and expected manner.

426. Plaintiffs made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiffs chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiffs relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

427. Prior to Plaintiffs' purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiffs of the Battery Defect or FORM Defect in the Vehicle. Plaintiffs reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiffs reasonably

expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiffs reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiffs reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

428. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiffs and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

429. As a result of the defects, Plaintiffs' Vehicle was subject to FCA Recalls B9A, 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiffs of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiffs' Vehicle was diminished, Plaintiffs were deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiffs were deprived of the benefits of a PHEV for which Plaintiffs paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiffs to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

430. As a result of the defects, Plaintiffs suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiffs known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery

would be prohibited or that Plaintiffs would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiffs and exposing the Vehicle to the weather and the elements, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiffs had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiffs of the electric range and eMPG that was expected, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it.

431. At the time of the purchase, Plaintiffs were unaware of the defects. Had Plaintiffs known the true facts about the Vehicle, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the defects, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

432. Plaintiffs provided FCA with pre-suit notice and an opportunity to cure by letter dated October 21, 2026.

**Andre Relis**

433. Plaintiff Andre Relis is a citizen and resident of the State of California who leased a new 2022 Jeep Grand Cherokee 4xe, VIN 1C4RJYB60N8717740 (hereinafter, the "Vehicle") on or about November 29, 2022 from Santa Barbara CDJR in Santa Barbara, California. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

434. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features

and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

435. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

436. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

437. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions

accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

438. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

439. At the time of the lease, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

440. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Richard Pfaff**

441. Plaintiff Richard Pfaff is a citizen and resident of the State of California who leased a new 2022 Jeep Grand Cherokee 4xe, VIN 1C4RJYB60N8763570 (hereinafter, the "Vehicle") on or about December 11, 2022 from Cerritos CDJR in Cerritos, California. Plaintiff leased the

vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

442. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

443. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

444. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

445. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived

Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

446. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

447. At the time of the lease, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

448. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Ayush Saraogi**

449. Plaintiff Ayush Saraogi is a citizen and resident of the State of Texas who leased a new 2022 Jeep Grand Cherokee 4xe, VIN 1C4RJYB60N8716491 (hereinafter, the "Vehicle") on or about December 17, 2022 from Watsonville CDJR in Watsonville, California. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

450. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

451. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

452. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty

when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

453. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

454. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

455. At the time of the lease, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff

suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

456. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Michigan Plaintiffs**

**Juanita Laskey**

457. Plaintiff Juanita Laskey is a citizen and resident of the State of Michigan who leased a 2022 Jeep Wrangler 4xe, VIN 1C4JJXP65NW277929 (hereinafter, the "Vehicle") on or about December 22, 2022 from Bill Marsh CDJR in Traverse City, Michigan. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

458. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

459. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle

would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

460. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

461. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

462. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff

would not have leased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

463. At the time of the lease, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

464. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Cynthia Slack**

465. Plaintiff Cynthia Slack is a citizen and resident of the State of Michigan who leased a 2021 Jeep Wrangler 4xe, VIN 1C4JJXP66MW835883 (hereinafter, the "Vehicle") on or about December 4, 2022 from Szott Auto Group in New Baltimore, Michigan. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

466. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle,

including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

467. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

468. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

469. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

470. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

471. At the time of the lease, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

472. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Blair McNamara**

473. Plaintiff Blair McNamara is a citizen and resident of the State of Michigan who leased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXR62PW524761 (hereinafter, the "Vehicle") on or about December 1, 2022 from Betten Baker CDJR in Coopersville, Michigan. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

474. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

475. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

476. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

477. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised,

the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

478. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

479. At the time of the lease, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

480. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated March 20, 2026.

**Jeffrey and Lara Boggs**

481. Plaintiffs Jeffrey and Lara Boggs are citizens and residents of the State of Michigan who leased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXR68PW511240 (hereinafter, the "Vehicle") on or about November 7, 2022 from Al Serra CDJR in Grand Blanc, Michigan. Plaintiffs leased the vehicle for personal, family or household use. Plaintiffs always used the vehicle in the normal and expected manner.

482. Plaintiffs made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiffs chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiffs relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

483. Prior to Plaintiffs' lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiffs of the Battery Defect in the Vehicle. Plaintiffs reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiffs reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

484. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiffs and the battery was defective at that time.

Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

485. As a result of the Battery Defect, Plaintiffs' Vehicle was subject to FCA Recalls B9A, 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiffs of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiffs' Vehicle was diminished, Plaintiffs were deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiffs were deprived of the benefits of a PHEV for which Plaintiffs paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiffs to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

486. As a result of the Battery Defect, Plaintiffs suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiffs known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiffs would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiffs and exposing the Vehicle to the weather and the elements, Plaintiffs would not have leased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiffs suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

487. At the time of the lease, Plaintiffs were unaware of the Battery Defect. Had Plaintiffs known the true facts about the Vehicle, Plaintiffs would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the Battery Defect, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

488. Plaintiffs provided FCA with pre-suit notice and an opportunity to cure by letter dated March 20, 2026.

**Misty Erpelding**

489. Plaintiff Misty Erpelding is a citizen and resident of the State of Michigan who leased a 2023 Jeep Wrangler 4xe, VIN 1C4JJXR69PW536924 (hereinafter, the "Vehicle") on or about December 7, 2022 from Suburban CDJR in Troy, Michigan. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

490. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

491. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably

expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

492. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

493. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

494. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly

inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

495. At the time of the lease, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

496. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated March 20, 2026.

**Robert Dodge**

497. Plaintiff Robert Dodge is a citizen and resident of the State of Michigan who purchased a 2022 Jeep Grand Cherokee 4xe, VIN 1C4RJYB66N8746983 (hereinafter, the "Vehicle") on or about December 22, 2022 from Courtesy CDJR in Grand Rapids, Michigan. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

498. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle,

including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

499. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

500. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

501. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying

FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

502. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

503. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

504. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated March 20, 2026.

**Michael Konyvka**

505. Plaintiff Michael Konyvka is a citizen and resident of the State of Michigan who leased a 2022 Jeep Grand Cherokee 4xe, VIN 1C4RJYB6XN8756951 (hereinafter, the "Vehicle")

on or about December 22, 2022 from Parkway CDJR in Clinton Township, Michigan. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

506. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

507. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

508. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

509. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

510. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

511. At the time of the lease, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

512. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Don Arndt**

513. Plaintiff Don Arndt is a citizen and resident of the State of Michigan who leased a 2022 Jeep Grand Cherokee 4xe, VIN 1C4RJYC67N8760504 (hereinafter, the "Vehicle") on or about December 21, 2022 from LaFontaine CDJR in Farmington Hills, Michigan. Plaintiff leased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

514. Plaintiff made the decision to lease the Vehicle after considering FCA's representations about the vehicle, including the reported range and effective mileage. Plaintiff chose the Vehicle based on the vehicle's represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In leasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

515. Prior to Plaintiff's lease, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire.

516. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was leased by Plaintiff and the battery was defective at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the defective battery within a reasonable time.

517. As a result of the Battery Defect, Plaintiff's Vehicle was subject to FCA Recalls 95B and 68C. The battery defect, FCA's recalls and FCA's accompanying instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the performance of the Vehicle suffered, the vehicle's range was diminished, and the effective MPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

518. As a result of the Battery Defect, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defect and did not receive the benefit of the bargain after leasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. As a result of the Battery Defect, Plaintiff suffered mental anguish damages due to the reasonable fear that the Vehicle could catch fire.

519. At the time of the lease, Plaintiff was unaware of the Battery Defect. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have leased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the Battery Defect, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

520. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated March 20, 2026.

**Fritz and Jan Erickson**

521. Plaintiffs Fritz and Jan Erickson are citizens and residents of the State of Michigan who purchased a 2022 Jeep Grand Cherokee 4xe, VIN 1C4RJYD65N8735714 (hereinafter, the "Vehicle") on or about November 12, 2022 from Marlette CDJR in Marlette, Michigan. Plaintiffs purchased the vehicle for personal, family or household use. Plaintiffs always used the vehicle in the normal and expected manner.

522. Plaintiffs made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiffs chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiffs relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

523. Prior to Plaintiffs' purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiffs of the Battery Defect or FORM Defect in the Vehicle.

Plaintiffs reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiffs reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiffs reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiffs reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

524. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiffs and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

525. As a result of the defects, Plaintiffs' Vehicle was subject to FCA Recalls 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiffs of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiffs' Vehicle was diminished, Plaintiffs were deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiffs were deprived of the benefits of a PHEV for which Plaintiffs paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiffs to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

526. As a result of the defects, Plaintiffs suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect

and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiffs known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiffs would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiffs and exposing the Vehicle to the weather and the elements, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiffs had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiffs of the electric range and eMPG that was expected, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it.

527. At the time of the purchase, Plaintiffs were unaware of the defects. Had Plaintiffs known the true facts about the Vehicle, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the defects, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

528. Plaintiffs provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**Rodny Helal**

529. Plaintiff Rodney Helal is a citizen and resident of the State of Michigan who purchased a 2022 Jeep Grand Cherokee 4xe, VIN 1C4RJYE61N8725020 (hereinafter, the "Vehicle") on or about November 18, 2022 from LaFontaine CDJR of Fenton in Fenton, Michigan. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

530. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

531. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

532. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

533. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

534. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

535. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered

overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

536. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated April 17, 2026.

**<u>Sean Scherer</u>**

537. Plaintiff Sean Scherer is a citizen and resident of the State of Michigan who purchased a 2022 Jeep Grand Cherokee 4xe, VIN 1C4RJYE61N8749558 (hereinafter, the "Vehicle") on or about December 22, 2022 from Champion CDJR in Lansing, Michigan. Plaintiff purchased the vehicle for personal, family or household use. Plaintiff always used the vehicle in the normal and expected manner.

538. Plaintiff made the decision to purchase the Vehicle after considering FCA's representations about the vehicle, including the reported electric-only range and eMPG. Plaintiff chose the Vehicle based on the vehicle's represented electric-only range, eMPG, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the vehicle, Plaintiff relied on FCA's implied warranty that the vehicle, including its electric battery, would be merchantable and fit for its ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

539. Prior to Plaintiff's purchase, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiff of the Battery Defect or FORM Defect in the Vehicle. Plaintiff reasonably expected that the Vehicle, including its electric battery, would function normally in accordance with FCA's specifications and representations. Plaintiff reasonably expected that the Vehicle would be capable of being charged without compromising its safety or exposing the

Vehicle to a risk of fire. Plaintiff reasonably expected that the Vehicle could be safely parked and charged inside a garage without the risk of fire. And Plaintiff reasonably expected that the Vehicle would provide consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments.

540. The Vehicle had less than 100,000 miles and was still covered by the implied warranty when the vehicle was purchased by Plaintiff and the Battery Defect and FORM Defect existed at that time. Moreover, the Vehicle had less than 100,000 miles and was still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect or FORM Defect within a reasonable time.

541. As a result of the defects, Plaintiff's Vehicle was subject to FCA Recalls 95B and 68C. The Battery Defect, the FORM Defect and FCA's recall instructions deprived Plaintiff of the use and benefit of the Vehicle's electric battery. As a result, the range of Plaintiff's Vehicle was diminished, Plaintiff was deprived of the environmental benefits that were promised, the acceleration of the Vehicle suffered, the vehicle's range was diminished, and the eMPG of the Vehicle was greatly reduced. In short, Plaintiff was deprived of the benefits of a PHEV for which Plaintiff paid a substantial premium. To make matters worse, the instructions accompanying FCA's recalls forced Plaintiff to park the Vehicle outside and away from other vehicles, causing great burden and inconvenience and exposing the vehicle to the elements.

542. As a result of the defects, Plaintiff suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Battery Defect and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicle. Had Plaintiff known that the Vehicle presented a risk of a catastrophic fire, that the use of the Vehicle's electric battery would be prohibited or that Plaintiff would be forced to park the Vehicle outdoors and away from

other vehicles, greatly inconveniencing Plaintiff and exposing the Vehicle to the weather and the elements, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Similarly, if Plaintiff had known that the FORM Defect would interfere with the Vehicle's electric-only or electric-assisted operation, depriving Plaintiff of the electric range and eMPG that was expected, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

543. At the time of the purchase, Plaintiff was unaware of the defects. Had Plaintiff known the true facts about the Vehicle, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defects, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the Vehicle's acquisition.

544. Plaintiff provided FCA with pre-suit notice and an opportunity to cure by letter dated March 20, 2026.

**Defendant**

545. Defendant FCA US, LLC ("FCA") formerly known as Chrysler Group, is a Delaware limited liability company organized and existing under the laws of the State of Delaware, and is wholly owned by Stellantis N.V., a Dutch corporation headquartered in Amsterdam, Netherlands. FCA's principal place of business and headquarters is at 1000 Chrysler Drive, Auburn Hills, Michigan 48326.

546. FCA is a motor vehicle manufacturer and a licensed distributor of new, previously untitled Chrysler, Dodge, Jeep, and Ram brand motor vehicles. FCA's Chrysler brand is one of the "Big Three" American automobile brands. FCA engages in commerce by distributing and selling new and used passenger cars and motor vehicles under its Chrysler, Dodge, Jeep, and Ram brands.

547. FCA, through its various entities, designs, manufactures, markets, distributes, and sells automobiles throughout the United States and worldwide. FCA and/or its agents designed and manufactured Plaintiff's Vehicles. FCA also developed and disseminated the owner's manuals and warranty booklets, advertisements, brochures, and other promotional materials relating to Plaintiffs' Vehicles, with the intent that such documents be reviewed and relied on by purchasers such as Plaintiff. FCA is engaged in interstate commerce, selling vehicles through its network in every state of the United States.

## VENUE AND JURISDICTION

548. This Court has original jurisdiction to hear this case by virtue of 15 U.S.C. § 2310(d)(1)(A), the Magnuson-Moss Warranty Act, conferred under 28 U.S.C. § 1131. The amount in controversy exceeds $50,000 (exclusive of interest and costs) computed on the basis of all claims to be determined in this suit. The Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

549. This Court has personal jurisdiction over FCA because FCA is a Delaware corporation and thus a citizen of Delaware. FCA conducts substantial business in this District. There are sufficient minimum contacts between FCA and Delaware such that the exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice.

550. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because FCA is incorporated in this District , conducts substantial business in this District and is subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

551. FCA markets and sells the Jeep Wrangler 4xe and Jeep Grand Cherokee 4xe (collectively, the "Vehicles") as safe, dependable, rugged, high-performing, and emissions-friendly hybrid-electric vehicles.

552. This action arises out of FCA's failure to disclose and then adequately repair two uniform and widespread defects in 2020-2026 Jeep Wrangler 4xe and 2022-2026 Jeep Grand Cherokee 4xe vehicles (hereinafter "Defective Vehicles" or "Vehicles"). The first defect is in the lithium-ion battery (hereinafter the "Defective Battery") in the Jeep Vehicles that has led to numerous fires, safety recalls and guidance from FCA that imposes highly restrictive limitations on consumers' use of the vehicles. The defect causes the high voltage battery to overheat, which can result in catastrophic and destructive fires, resulting in an unreasonable safety risk to the drivers and passengers of vehicles equipped with the Defective Battery. As a result of the Battery Defect, FCA issued recall nos. B9A, 95B and 68C between November 2023 and October 2025.

553. The second defect manifests when the Vehicles automatically, improperly, and frequently enter and remain stuck in the Fuel and Oil Refresh Mode ("FORM") for extended periods of time, which makes electric-only or electric assisted driving impossible (the "FORM Defect").

### The development and marketing of the Defective Vehicles.

554. The Jeep Wrangler and Jeep Grand Cherokee are popular sport utility vehicles that FCA designs, manufactures, and sells under the Jeep brand. The Jeep brand traces its lineage to the original U.S. military Jeeps that were produced during World War II.

555. The original Jeep Cherokee was introduced in 1975 as a "a sporty, two-door version of the Wagoneer and featured bucket seats, a sports steering wheel, and racy detailing designed to

appeal to younger, more adventurous drivers." In 1984, the "all-new" Jeep Cherokee was re-introduced as "the first compact four-door SUV, first uniframe construction, and first full-time 4x4 system with shift-on-the-fly capability."

556. In the 1990s, the Jeep brand continued to introduce vehicles that met consumer desires for "sporty" and "capable" sport utility vehicles (SUVs), including several iterations of the Jeep Wrangler and Grand Cherokee models. In 1993, Jeep introduced the Jeep Grand Cherokee as a mid-sized luxury SUV.

557. A few years later in 1999, the Jeep Brand also released the "the new Grand Cherokee (WJ)," which it "marketed as the most capable SUV ever." In 1997, the Jeep brand added the "super-capable Wrangler (TJ) with its new coil suspension" to its lineup.

558. In the past two decades, sensitivity to higher fuel prices and increased concern about the negative environmental effects of gas-powered vehicle emissions have resulted in a trend away from the gas-guzzling, SUV-heavy vehicle lineups that dominated the end of the 20th century. In response, manufacturers shifted towards electrification and production of hybrid-electric vehicles, which offer greater gas mileage and less emissions.

559. In 2020, FCA announced the Jeep plug-in hybrid Wrangler 4xe in response to these trends and in an effort to mitigate the poor gas mileage caused in part by its past designs. In 2022, FCA added the Jeep Grand Cherokee 4xe to its lineup, using the same 4xe moniker it used with the Wrangler 4xe. The 4xe (or "four-by-e") name is a play on the Jeep brand's reputation for 4x4 vehicles that highlights the Defective Vehicles' rugged four-wheel drive and modern electric capabilities.

560. FCA pervasively advertised the Jeep Wrangler 4xe and Jeep Grand Cherokee 4xe as offering similar performance and capability as the gas-powered equivalents, but with all the environmental and mileage benefits of a plug-in hybrid electric battery.

561. FCA also pervasively represented that plug-in hybrid-electric vehicles like the Defective Vehicles have significant environmental advantages over conventional vehicles with internal combustion engines. While operating in electric mode, the Defective Vehicles do not produce any of the noxious tailpipe emissions (such as nitrogen oxides and other smog-forming pollutants that are harmful to human health, and greenhouse gases, such as carbon dioxide and methane) that vehicles with internal combustion engines produce.

562. FCA knew that one of its largest customer bases are outdoor enthusiasts, who are often invested in issues such as climate change and environmental protection. It explicitly sought to exploit these consumer desires for a greener vehicle in their marketing. As explained by an FCA marketing executive: "With Jeep, you have the DNA of adventure and freedom, meaning that our customer already is in a relationship with the planet. . . . But some are maybe 'cheating' in the sense that they don't want to think about the fact that internal-combustion vehicles pollute. Some are in an open relationship with the planet but like combustion cars. And some are in true love with the planet and nature, and these are the consumers we want to start with" in promoting the Wrangler 4xe.

563. FCA also announced the Wrangler 4xe with a broadly disseminated advertisement narrated by Carl Sagan, a noted science educator and climate change activist. It concluded by showing the 4xe climbing a mountain and describing it as "the first-ever electric Wrangler."

564. In addition to embracing the environmental benefits of reduced gas consumption, Jeep also pervasively advertised the plug-in hybrid-electric design as a performance enhancer.

When working together, the hybrid and electric power sources are supposed to provide more power and torque than Jeeps with traditional internal combustion engines, giving the Defective Vehicles faster acceleration and better performance.

565. For example, FCA advertised that the 2021 Jeep Wrangler output was capable of 470 pound-feet (lb.-ft.) of torque at 3,000 revolutions per minute (rpm) and 375 horsepower (hp) at 5,250 revolutions per minute, all while achieving 49 MPGe. By comparison, the lower-cost, gas-powered 2021 Jeep Wrangler with a 2.0 liter turbocharged four-cylinder gas engine could only put out a relatively meager 295 lb.-ft. of torque and 270 hp, with a combined city and highway gas mileage of 21 mpg.

566. FCA similarly touted the Jeep Grand Cherokee 4xe's performance and range numbers. At release, FCA represented that: "Overall, the 4xe system delivers 375 horsepower (280 kW) and 470 lb.-ft. (637 Nm) of torque. The Grand Cherokee 4xe, targeting an estimated 25 miles (40 km) of all-electric range, returns an estimated 57 MPGe and has an estimated total range of more than 440 miles (708 km)." FCA reassured consumers, "Don't let the near-silence of all-electric operation fool you—the legendary capabilities of Grand Cherokee still roar beneath this hood."

567. FCA also represented that the Grand Cherokee 4xe was all of what its gas-powered predecessor was and more because it was "designed and engineered to deliver even more of what has made the Grand Cherokee a true global icon in the premium SUV segment, including legendary Jeep 4x4 capability, class-leading space and versatility and advanced safety features."

568. In introducing the Defective Vehicles, Christian Meunier, the then-Global President of the Jeep Brand, stated: "Our Jeep 4xe vehicles will be the most efficient, responsible and capable that the brand has ever created." FCA's pervasive marketing messaging for the

Defective Vehicles effectively conveyed to consumers that they could have the best of all worlds—an adventurous 4x4 vehicle that was also emissions friendly and technology driven. Or, as FCA puts it: "Yes, you can have both."

569. The notion that the Defective Vehicles represented the best of all worlds was repeated in literature directed at potential buyers. For example, the vehicle brochure for the 2021 Jeep Wrangler 4xe states that the vehicle includes a "17-kwh Battery" and "is a shining example of hybrid innovation, handing you tomorrow's progressive technology, today," while also providing "the rugged, open-air freedom and legendary capability that Jeep Wrangler is revered for, the world over."

570. In addition to highlighting the off-road capabilities of the Jeep Wrangler 4xe, FCA also pervasively marketed the vehicle as fit for city driving, especially in all-electric mode. For example, the vehicle brochure for the 2021 Jeep Wrangler 4xe highlighted how the driver could choose between different modes of the hybrid drivetrain under the banner of "POWER x2," including an electric-only mode and an "E-SAVE" mode for "low-emission zones in cities."

571. FCA published similar messaging and advertising about the Grand Cherokee 4xe, which likewise features a 17-kwh HV Battery and dual electric motor setup like the Wrangler 4xe. FCA again advanced the notion that the Jeep Grand Cherokee 4xe, like the Wrangler 4xe before it, was the best of all worlds.

572. FCA has continually marketed the Defective Vehicles to gas-conscious consumers by making representations about the efficiency of both vehicles compared with their gas-powered equivalents. This includes, among other things, claiming that the Jeep Grand Cherokee 4xe "has the lowest estimated annual fuel cost of any Grand Cherokee ever," and that by buying the vehicle, they could bid "goodbye to the gas light."

573. FCA also repeatedly emphasized in its marketing and other pervasive statements the performance capabilities of the Jeep Wrangler 4xe in all-electric mode. In 2021, FCA announced plans to install Jeep-branded EV charging stations at popular off-road trailheads, including in Moab, Utah; Big Bear, California; and the Rubicon Trail in Pollock Pines—the namesake of one of the 4xe trim levels. Alongside this announcement, FCA touted that, "[w]ith 49 MPGe and 21 miles of all-electric range, the Jeep Wrangler 4xe can conquer even the toughest trails with zero emissions."

574. Notably, the advertised 49 eMPG is only achievable in all-electric mode. Without the ability to charge the vehicle, the 2023 Jeep Wrangler 4xe can achieve only 20 MPG in hybrid mode and the Grand Cherokee only 23 MPG in hybrid mode. Thus, the all-electric mode and convenience of charging at home are central to the value proposition of the Defective Vehicles. To that end, FCA highlighted the convenience of charging inside or near the home. FCA included a 25-foot 110v charger in the purchase of every 4xe vehicle. The relatively limited range of the cord implied that the vehicle was safe to charge within or near the owner's home. FCA also impliedly represented to each consumer that frequent charging was safe to do over and over, by stating in the manual that "[l]ithium-ion batteries can be recharged and discharged thousands of times."

575. FCA portrayed the Defective Vehicles as plug-in hybrid SUVs capable of running off either gasoline or electricity. The Vehicles "pair a traditional gas engine with … incredible electric motor performance," providing drivers with the option to operate their vehicles using only the electric motor, only the gasoline internal combustion engine, or as a hybrid. "Electric mode" is touted as allowing for "nearly zero tailpipe emissions up to highway speeds," and FCA boasts that the Wrangler 4xe "can run on this mode for a distance of up to 21 total miles on a full charge."

576. The purported benefits of the plug-in hybrid-electric design came at a hefty premium to consumers: the Jeep Wrangler and Grand Cherokee 4xe models cost thousands of dollars more than similarly equipped Jeep Wranglers and Grand Cherokees with conventional, non-hybrid internal combustion engines. And while FCA highlighted the electric battery features to justify this premium cost, FCA's marketing never disclosed to consumers that the Defective Vehicles were equipped with dangerous batteries susceptible to fire, even when the vehicle is turned off and not charging. Nor did FCA's marketing disclose to consumers that they would not be able to charge their vehicles or park them indoors due to the Defective Battery and resulting fire risk.

577. FCA also touted the array of safety features in the Defective Vehicles. For example, the vehicle brochure for the 2022 Jeep Wrangler 4xe highlighted its "advanced safety & security systems" and states, "when it comes to your well-being on the road Jeep Wrangler is ready and willing to stand as a constant guardian." FCA's marketing materials repeatedly emphasized the vehicles' safety, durability, and reliability, evidencing the materiality of these features to buyers. The brochures for the Defective Vehicles prominently advertised their advanced safety features: They also boasted of the vehicles' superior quality and workmanship. However, FCA never disclosed the existence of the Battery Defect.

578. Without the ability to charge the Defective Vehicles, consumers cannot make use of the much-advertised "all-electric" and "e-save" modes. The only practically available mode without plug-in charging capability is "hybrid," which is actually less fuel efficient than the gas-powered 4xe. As noted in Car and Driver, "[t]o get the full fuel-economy benefit [of the 2021 Wrangler 4xe], you'll have to stay close to home and plug in often. Once the battery has been depleted, the 4xe actually gets worse fuel economy than a Wrangler powered by the turbo four

with none of the plug-in-hybrid hardware (20 versus 22 mpg combined). Blame the extra 800 pounds that the 4xe carries wherever it goes."

579. After extensively advertising the Defective Vehicles as a fuel-efficient, environmentally-friendly alternative since launch, the Wrangler 4xe -- weighed down by its underutilized electric motors and battery -- is actually slightly less fuel efficient than its lighter, gas-powered cousin. The Grand Cherokee 4xe with an unutilized HV Battery suffers from the same issues. The promise of FCA's various advertisements was thereby left unrealized. Certainly, FCA never disclosed in these numerous commercials or on its website that the Defective Vehicles would consume more fuel (or about the same amount of fuel) than its significantly less expensive gas-powered equivalent if the Defective Vehicles' hybrid and electric features could not be used as intended. By depriving Plaintiffs of their ability to charge their vehicles frequently and conveniently, FCA deprived them of a major value-proposition for the Defective Vehicles: less fuel consumption.

580. FCA also described the Wrangler 4xe as "the most capable, technically advanced and eco-friendly Wrangler ever." The Wrangler 4xe boasted "375 horsepower, an EPA fuel economy of 49 MPGe with the battery charged, and 21 miles of guilt-free electric driving before the gas engine kicks on" and promised "to combine contradictory attributes—power and efficiency—into a single product that would have been unthinkable just 10 years ago." FCA prominently displays the Jeep Wrangler 4xe's 21-mile all-electric range throughout its website. As a result of this 21-mile electric driving range, FCA claimed that users would have the opportunity to "get around town solely on electric power. The Jeep Wrangler 4xe's product page states that its default setting is to run in Hybrid mode, meaning that it consumes electric power first until it runs out of charge, and then uses its gasoline engine. The Jeep Wrangler 4xe's product

page also states that the Vehicle can run in Electric Mode, off of battery power alone, "[w]hen the battery has more than a 1% charge," and is capable of running in this mode "for up to 21 miles."

581. Like other hybrid and plug-in hybrid offerings, the Jeep Wrangler 4xe has both a gasoline engine and electric motors to enable gasoline-only, battery only—or a combination of the two—driving. In its promotional materials, FCA stated it had "logged over 1.4 million miles of real world on-road and off-road validation in all the corners of the world to make sure it's ready. We want to make sure this 'do anything' Wrangler does everything we promised."

582. After the success of the Jeep Wrangler 4xe, FCA introduced the Jeep Grand Cherokee 4xe for the 2022 model year. FCA describes the Grand Cherokee 4xe as "[u]ncompromising, sophisticated and remarkably capable[.]" The 2022 and 2023 Jeep Grand Cherokee 4xe "uses the same plug-inhybrid powertrain as the Wrangler [4xe]," including the same 400-volt, 17-kWh EV battery. In addition, as with the Wrangler 4xe, "[t]he battery pack system includes a dedicated heating and cooling circuit to keep the battery at its optimum temperature for best performance." The Grand Cherokee 4xe also features the same three driving modes as the Wrangler 4xe—Hybrid, Electric, and Esave—which provide the same functionality as its Wrangler 4xe counterpart. FCA's website emphasizes that the Grand Cherokee 4xe can achieve up to 25 miles of "pure EV driving" that helps Grand Cherokee 4xe owners "handle daily commutes."

583. As part of its ad campaigns, FCA put forth, and continues to put forth, advertisements showcasing the Defective Vehicles' ability to function in cold weather. The advertisements for the 4xe Vehicles go so far as to emphasize their durability in winter conditions, with ads showing the Vehicles on snowy roads or carrying ski and snowboard equipment. At no point did FCA inform the public that the ability to use the Defective Vehicle's all-electric mode would be compromised when the vehicles are driven in cold weather.

584. While FCA highlighted the all-electric range of the Vehicles in order to justify this premium cost, FCA's marketing never disclosed to consumers that the FORM Defect could render electric-only or electric assisted propulsion unavailable for long periods in cold weather that is typically found in Tennessee and Tennessee in the winter months and could interfere with the Vehicles' acceleration. In addition to concealing the FORM Defect, FCA actively mispresented the attributes and capabilities of the Vehicles by claiming, among other things, that the vehicles had been thoroughly tested.

585. Once the FORM Defect triggers, customers report having almost no access to electric-only or electric assisted vehicle operation for days, weeks, or months at a time, particularly, but not exclusively, during colder temperatures. The FORM Defect also interferes with the Vehicles' acceleration. The FORM Defect eliminates the benefits of the Vehicles' purportedly unique plug-in hybrid operations and creates a serious safety hazard. Plaintiffs paid a significant premium for the 4xe plug-in hybrid vehicles over the internal combustion-only versions of the same models, and therefore overpaid at the time of purchase for a feature that is not usable as represented. Had Plaintiffs known of the FORM Defect, they would not have purchased the "hybrid" Vehicles or would have paid considerably less for them.

**<u>The Vehicles are unreasonably dangerous due to the Battery Defect</u>**

586. Lithium-ion batteries, such as the Defective Batteries used in the Defective Vehicles, are used in most electric vehicles because of their "high power-to-weight ratio, high energy efficiency, good high-temperature performance, and low self-discharge." However, these batteries also have a well-documented history of fire issues. Safety concerns related to unexpected fires have been well documented, including a battery fire that happened weeks after the crash test of a Chevy Volt in 2011 and several Tesla Model S vehicles that suddenly caught fire while parked,

and are known to FCA. Unfortunately, FCA ignored safety concerns in order to market the Vehicle's range, despite warnings published in October 2017 by the National Highway Traffic Safety Administration ("NHTSA") that overcharging lithium-ion batteries can result in one of several exothermic reactions that have the potential to initiate thermal runaway resulting in a spontaneous ignition.

587. Like other batteries, lithium-ion batteries are made up, in pertinent part, of multiple power-generating compartments called "cells." Each cell contains the basic functional components of a battery: a positive electrode, a negative electrode, and an electrolyte.

588. The lithium-ion batteries in the Defective Vehicles were produced by Samsung SDI. Samsung SDI also manufactured the cells contained in batteries that allegedly caused fires in certain BMW and Ford models that have been recalled and subject to litigation. Those Ford and BMW recalls occurred in 2020, and upon information and belief, were caused by similar defective attributes as present here. According to BMW, the fires that led to recall of their PHEVs were caused by "thermal events" in the Samsung batteries.

589. As set forth below, FCA knew of the risk from the Defective Batteries from various sources, including: the well-documented risks of runaway propagation in lithium-ion batteries; NHTSA warnings of safety risks for lithium-ion batteries; the well-known risks of violent combustion from the NMC batteries used in the Defective Vehicles; the rigorous pre-launch testing FCA must have done on the Defective Vehicles' HV Battery and hybrid propulsion system; consumer complaints lodged with NHTSA, FCA, and publicized online; and similar battery fire issues in other hybrid electric vehicles, including FCA's Chrysler Pacifica PHEVs, and BMW and Ford-manufactured vehicles that use Samsung batteries for electric propulsion. Through this accumulated knowledge, FCA was aware of the serious danger of the Defective Batteries by the

time it released the Defective Vehicles into the market, and certainly well before it issued its November 2023 recall.

590. The dangers inherent in lithium-ion electric car batteries were well-known to FCA before FCA sold the first Jeep PHEV. An October 2017 NHTSA Paper titled Lithium-ion Battery Safety Issues for Electric and Plug-in Hybrid Vehicles explained:

- Li-ion battery technology is in the development stage and is not yet settled.
- As battery technology matures, the safety risks may increase as manufacturers attempt to obtain greater performance from existing chemistries and adopt new chemistries with less field experience. Increasing the bounds of performance implies operating the battery cells closer to limits where damage initiation and growth, leading to failure, can occur.
- The investigation conducted here demonstrates that there are numerous external events or processes in the life of a vehicle that could contribute to damage and failure of a Li-ion battery.
- Exothermic reactions and/or internal electrical shorts may be triggered by manufacturing defects . . . . If allowed to continue, these reactions or shorts can create conditions for self-heating within the cell; which grow to become uncontrolled increases in temperature and pressure (thermal runaway); and potentially end in venting or catastrophic failure of the cell.
- The assessment conducted here suggests that codes and standards for Li-ion battery vehicle systems are in their early development stages and immature at this time. The assessment suggests there are gaps and risks inherent in new and rapidly evolving technology including:
- Immature design and manufacturing standards;
- Immature safety systems integration requirements;
- Immature quality control requirements;
- Immature battery life cycle durability requirements.
- The results of this investigation show that Li-ion battery technology is a rapidly evolving technology field that is far from settled.

- The risks associated with Li-ion battery systems derive fundamentally from the novelty of the technology and limited long-term experience base with its safety performance.

- The ability to store and deliver substantial energy onboard a vehicle also implies that substantial energy can be released, with corresponding hazards, in the case of failure. In this case, the energy is stored electrochemically in batteries, rather than chemically as a fuel. While systems safety engineering can achieve levels of safety with Li-ion technology comparable to that of conventional fuels, the automotive industry does not have decades of experience with it and the same understanding that it has concerning conventional and alternative fuels. Nor is there a directly comparable technology that can provide a strong experience base for development of safety requirements.

https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/12848-lithiumionsafetyhybrids_101217-v3-tag.pdf

591. A meta-review of lithium-ion battery ("LIB") fire safety, in an article published in the Journal of the Electrochemical Society, similarly stated:

- Although great success has been made on LIB commercialization, safety concerns have emerged because of unexpected fires. Some LIBs can display a tendency to ignite under abuse conditions and initiate fires or release toxic gases, thus creating a hazard. Moreover, as LIB technology moves to larger scales, from single cells to modules and packs, assuring their safety is an issue of growing severity and stakes. Exceeding the window of conditions in which LIBs operate safely can trigger thermal runaway (TR) and lead to fires.

- The temperature of the LIB reaches a critical value such that the reaction rate of an exothermic reaction increases the temperature, which in turn leads to further acceleration of the reaction rate. This positive feedback of temperature increase is a sign of ignition and creates the fire hazards. Once a cell fails, the large amount of heat generated could trigger the thermal runaway of adjacent cells, contributing to fire propagation. Fires on the module and pack scales can release large amounts of heat and toxic gases and are difficult to suppress.

- Internal cell defects and internal faults that develop inside individual cells over time, causing the initiation of thermal runaway, are a major concern for all industries which demand methods and tools to reliably identify them.

- Another important concern that most industries agree on is the importance of the scale at which the safety testing takes place. The tests performed at component level might not be comparable to the tests performed at system level. Most of the research on safety is performed on cell or small modules, and similar data at pack and system is scarce.

- LIB failure can occur very rapidly after a cell is damaged, or slowly over a long period of time, causing delayed failure long after the damage is initiated. The time in between is usually referred to as the incubation period which can last from several hours to years, depending on the cause and failure mechanism. However, when a critical point is reached, usually governed by the balance between heat generation and heat dissipation from the cell and battery pack to the environment, the failure happens very fast.

https://iopscience.iop.org/article/10.1149/1945-7111/aba8b9

592. Like other batteries, lithium-ion batteries are made up, in pertinent part, of multiple power-generating compartments called "cells." Each cell contains the basic functional components of a battery: a positive electrode, a negative electrode, and an electrolyte. In order to develop a battery that would deliver the advertised range, FCA developed a battery with "new cell design and chemistry." The battery contains "nickel-rich lithium-ion chemistry" that purportedly provides "improved thermal performance over other chemistries" and requires a "smaller active cooling system for more efficient packaging."

593. According to NHTSA, proper management of the electrical loads among cells in a pack helps maintain overall charge and discharge performance within an acceptable range. Because temperature is a key indicator of cell electrical performance (e.g., hotter cells may discharge or charge more quickly than colder cells), thermal management strategies must be integrated into the battery system design to monitor charging and discharging events and mitigate potentially problematic conditions that can create a risk of fires like those at issue here.

594. Most electric and hybrid-electric vehicles, like the Defective Vehicles, use lithium-ion batteries because of their "high power-to-weight ratios, high energy efficiency, good high-temperature performance, and low self-discharge. However, lithium-ion batteries carry well-documented risks of combustion if they are improperly used by an auto manufacturer or placed in vehicles that are defectively designed or manufactured or placed in vehicles that are defectively

designed or manufactured. Safety concerns related to unexpected fires connected with lithium-ion batteries are well-documented and were known to FCA at the time it designed, manufactured, and sold the Defective Vehicles. Even before NHTSA released its comprehensive report on lithium-ion battery safety issues in 2017, many scientific and engineering articles discussed the thermal-runaway-related safety concerns of lithium-ion cells and battery packs and proposed solutions.

595. The HV Battery Systems placed in the Defective Vehicles by FCA are nickel-manganese-cobalt compositions. Importantly, "Ni[ckel]-rich NMC cathode materials are known to be susceptible to certain safety issues, such as thermal runaway and the risk of triggering battery fires." Thus, especially for NMC battery systems, it is imperative to set appropriate controls regarding maximum and minimum state of charge, maximum and minimum cell and/or overall voltage, appropriate current limitations, as well as robust cell temperature monitoring features.

596. In particular, NMC batteries are particularly susceptible to "lithium plating," a dangerous phenomenon that increases the thermal runaway risks posed by lithium-ion batteries. Lithium plating occurs when metallic lithium deposits on the anode surface form tree-like structures called "dendrites." Those tree-like structures can then penetrate and damage the separator into the cathode and cause short circuiting, which in turn sparks a battery fire.

597. Dendrite formation—a form of internal physical damage to the battery—can occur as a result of repeated use and/or charging of the battery or its cells outside of manufacturer specifications. The effect of dendrite formation that leads to increased risk of short-circuit and thermal runaway is therefore cumulative; it increases as the battery or its cells are repeatedly subjected to improper use and/or charging conditions.

598. Significantly, the documented fires in the Defective Vehicles do not appear to be the result of external damage or misuse by the consumer. Upon information and belief, all reported

fires to date have resulted from internal battery failure while the cars are parked and turned off, which points to either improper programming or internal issues within the battery.

599. Despite the known fire risk of the particular composition of these HV Batteries, FCA's design of the Jeep Wrangler 4xe and the Jeep Grand Cherokee 4xe placed the HV Battery directly inside the passenger compartment of the vehicle underneath the rear seat bench. The location of the battery within the cabin means that the combustion of the battery and outgassing of toxic chemicals occurs in the cabin of the Defective Vehicles, which at least one firefighting expert has described as a "terrible idea in my mind."

600. Just as important as the design and safety features used in a lithium- ion battery pack is rigorous pre-launch testing. The use of better safety systems and more rigorous testing would have prevented the reported battery fire incidents in the Defective Vehicles.

601. The dilemma facing electric and plug-in hybrid electric vehicles is that incorporating adequate safety measures is not only expensive, but also "is likely to reduce the vehicle's range because any protective materials means less space for the electricity-storing cells." On information and belief, FCA skimped on available protection measures in order to promote the high electric mode range and overall range, speed of charging, and other desirable features of the Defective Vehicles—all to the benefit of FCA's bottom line and to the detriment of owners and lessees of the Defective Vehicles.

**<u>The Vehicles are unreasonably dangerous due to the FORM Defect</u>**

602. The Vehicles are also unreasonably dangerous due to the FORM Defect. When the Vehicles enter and remain in FORM, and the electric propulsion system is unavailable, the Vehicles' acceleration is compromised. This problem makes merging difficult and dangerous, especially when entering a highway. The danger is exacerbated because the Plaintiffs cannot

determine when their Vehicles will enter FORM how long they will stay in FORM and what conditions will allow them to exit FORM. As a result, the acceleration of Plaintiffs' Vehicles is erratic and unpredictable, creating a serious safety risk.

**FCA had advanced notice of the defects in the Defective Vehicles**

**A. FCA had advanced notice of the Battery Defect.**

603. FCA accumulated knowledge of the automotive industry's issues with the HV Battery packs it placed in the Defective Vehicles. Both the Wrangler 4xe and the Grand Cherokee 4xe utilize 17 kwh high-voltage lithium-ion battery packs, which were manufactured by Samsung SDI America Inc. ("Samsung").

604. Samsung has a history of issues with its high-voltage EV batteries, of which FCA has had notice of since at least 2020. In August 2020, for instance, Ford recalled its Kuga PHEV due to a battery defect and owners were told not to charge the battery. The battery manufacturer was Samsung. Similarly, BMW recalled over 26,000 of its vehicles due to defective batteries whereby "the battery production process allowed impurities to enter the cells." And around 2022, Samsung recalled more than 1,000 of its EV batteries (including in FCA vehicles) because of poor manufacturing quality.

605. FCA was also on notice of the Battery Defect because it accumulated knowledge of a similar defect in another FCA plug-in hybrid vehicle: the 2017-2018 Chrysler Pacifica plug-in hybrid minivan. Even before the first Jeep PHEV rolled off the lot, FCA began receiving reports of fires related to the HV battery system in Chrysler Pacifica Plug-in Hybrid, including a vehicle fire on April 23, 2019. Another occurred on June 15, 2019, where a Chrysler Pacifica exploded in front of a house while plugged in. The design of the particular parts of the Chrysler Pacifica plug-in that are related to the HV battery are similar to the analogous components in the Defective

Vehicles. On February 11, 2022, FCA issued a recall for more than 16,700 of its 2017-2018 Chrysler Pacifica plug-in hybrids due to rising reports of fires in those vehicles. It stated that, "[a] vehicle may experience a fire, even with the ignition in the 'OFF' mode," much like the Defective Vehicles.

606. FCA's knowledge of the Chrysler Pacifica fires dates as far back as 2019, so the associated battery issues in those vehicles predated its release of the Defective Vehicles in 2020 and any sale of the Defective Vehicles. FCA manufactured both of these plug-in hybrid systems and was therefore on notice that similar HV Battery parts were likely to cause fires, especially if they were programmed to be used inconsistently with industry standard safety guidelines.

607. FCA had exclusive and superior knowledge of the battery defects and Plaintiffs could not reasonably discover the defects through reasonable diligence. Among other sources, FCA knew or should have known of the widespread battery defect through widespread industry knowledge of the dangers inherent in lithium-ion electric car batteries, pre-production testing, pre-production design failure mode and analysis data, production design failure mode and analysis data, early reports of loss of propulsion in Jeep vehicles caused by low battery voltage, reports of fires caused by defective Jeep batteries, consumer complaints made to FCA's network of dealers and directly to FCA, aggregate warranty data compiled from FCA's network of dealers, testing conducted by FCA in response to consumer complaints, repair order and parts data received by FCA from FCA's network of dealers, recall notices, customer satisfaction notices ("CSNs"), technical service bulletins ("TSBs"), internal investigations and failure analyses, software updates, diagnostic software update vehicle data and NHTSA reports. Despite such knowledge, FCA suppressed the true facts in order to sell additional vehicles, avoid the cost of repairs, replacements or recalls, limit warranty claims and avoid bad press.

**B. FCA had advanced notice of the FORM Defect.**

608. FCA also had advanced notice of the FORM Defect through widespread pre-production testing, pre-production design failure mode and analysis data, production design failure mode and analysis data, consumer complaints made to FCA's network of dealers and directly to FCA, aggregate warranty data compiled from FCA's network of dealers, testing conducted by FCA in response to consumer complaints, repair order and parts data received by FCA from FCA's network of dealers, recall notices, customer satisfaction notices ("CSNs"), technical service bulletins ("TSBs"), internal investigations and failure analyses, software updates, diagnostic software update vehicle data and NHTSA reports.

609. FCA stated in the 2021 manuals for the Defective Vehicles that the vehicles will enter FORM to maintain engine lubrication properties "if the system detects a stale fuel or aged oil condition after a long period without combustion engine operation." When this message appears, owners are unable to access electric-only or electric-assisted propulsion to drive their vehicles.

610. But the truth is that the defective nature of the Vehicles results in FORM manifesting far more often and for longer than is reasonable. Indeed, Class Vehicles owners report having little to no access to electric-only or electric-assisted operation for months on end. As a result, the Defect frequently deprives the user of access to electric-only or electric-assisted driving.

611. In January 2022, FCA issued Technical Service Bulletins ("TSBs") relating to the FORM Defect. One TSB indicated that FORM cycles may be extended due to an issue with the PCM software, and provides for reprogramming that module. However, another TSB stated that the FORM cycles were operating as designed.

612. The 2021 Jeep Wrangler 4xe manual stated, prior to its revision after the 2021 Jeep Wrangler 4xe went on sale that: "[T]he engine may run for a period of up to 20 minutes when fully warm whenever the vehicle is operational (no electric only operation). If the vehicle is shut down before conditions to exit the refresh mode have been satisfied, the engine may run for additional time on subsequent trips." However, user experiences and FCA's own testing put FCA on notice that the Vehicles cold remain in FORM mode for up to 2.5 hours. User experiences and FCA's own testing also put FCA on notice that the FORM Defect was much more frequent and pronounced in cold weather environments. FCA concealed the true extent and nature of the FORM Defect from the public despite its advanced knowledge of the problem.

613. Even when FCA updated the owners' manuals for the Defective Vehicles, it continued to conceal the nature, extent and duration of the FORM Defect. Among other things, FCA failed to disclose the specific circumstances under which vehicles would enter FORM, the frequency with which Vehicle would enter FORM, the duration of time the Vehicles would remain in FORM or the circumstances under which the Vehicles would exit FORM.

**<u>FCA had a duty to disclose the defects</u>**

614. FCA had a duty to disclose the Defective Batteries and the FORM Defect as well as the safety risk caused by such defects because:

a. FCA was in a superior position to know the true state of facts about the Defective Vehicles, the Battery Defect and the FORM Defect and had exclusive knowledge of the defects based on sources not available to consumers;

b. Plaintiffs could not reasonably have been expected to learn or discover that their Vehicles were defective or had the Battery Defect or the FORM Defect;

c. FCA actively concealed the defects at issue, which were material facts of which it had exclusive knowledge;

d. FCA knew that Plaintiffs were not aware of the defects, that they could not reasonably have been expected to learn about or discover that their Vehicles were defective or had the Battery Defect or the FORM Defect, and that they would not have purchased the Vehicles, or would have paid substantially less for the Vehicles, had they been aware of the defects;

e. The existence of the defects was a material fact, pertaining to vehicle safety, that a reasonable consumer would consider highly material in determining whether to purchase or lease the subject vehicles and at what price; and

f. FCA made partial disclosures about the vehicles' range, the batteries' capabilities, the vehicles' safety and the vehicles' quality that were misleading without full disclosure of the defects.

Despite its duty to disclose, FCA actively concealed and failed to disclose the Battery Defect and FORM Defect.

**<u>As a result of the Battery Defect, fires began to occur after the Vehicles were launched</u>**

615. After FCA released the Defective Vehicles into the market, owners and lessees began complaining that their Defective Vehicles suddenly caught fire. According to FCA, between April and November 2023, at least eight Jeep Wrangler 4xes caught fire all while parked and turned off. According to FCA's recent 2024 Recall, an additional thirteen incidents occurred in Jeep Wrangler and Grand Cherokee 4xe's between April and July 2024. Numerous other fires were recorded in the NHTSA complaint database.

616. In addition to these incidents, FCA also had notice of the Defective Batteries through its buyback acquisition of Defective Vehicles and subsequent investigation. According to its 2023 Recall Part 573 Safety Recall Report, FCA requested buybacks of seven vehicles and received buybacks of two of those vehicles and disassembled the HV battery packs.

617. In addition to these earlier inspections, according to its Part 573 Recall Report for the more recent 2024 Recall, "FCA conducted further analysis of the battery packs from" certain Wrangler 4xe and/or Grand Cherokee 4xe Defective Vehicles that caught fire between April and July 2024.

618. All vehicle manufacturers, including FCA, routinely monitor and analyze NHTSA complaints to determine whether vehicles or components should be recalled due to safety concerns. Thus, on information and belief, FCA has knowledge of all NHTSA complaints filed concerning the vehicles it manufactures, including the Defective Vehicles. See TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

**Plaintiffs unknowingly purchased Defective Vehicles**

619. Plaintiffs made the decision to purchase their Vehicles after considering FCA's representations about the Vehicle, including the reported range and mileage. Plaintiffs chose their Vehicles based on the Vehicles' represented range, effective gas mileage, hybrid features and safety (including, without limitation, its ability to be free from a risk of battery fire and safely charged to 100%), the vehicle's alleged utility and FCA's reputation for manufacturing quality vehicles. In purchasing the Vehicles, Plaintiffs relied on FCA's implied warranty that the vehicles, including their electric batteries, would be merchantable and fit for their ordinary purpose of providing safe and reliable electric-assisted and electric-only transportation.

620. Prior to Plaintiffs' purchase of their vehicles, neither FCA nor any of its agents, dealers, or other representatives informed Plaintiffs of the Battery Defect or FORM Defect in the Vehicles. Plaintiffs reasonably expected that their Vehicles, including their electric batteries would function normally in accordance with FCA's specifications and representations. Plaintiffs reasonably expected that their Vehicles would be capable of being charged without compromising their safety or exposing the vehicle to a risk of fire. Plaintiffs reasonably expected that their Vehicles would reliably operate in electric-only mode in all conditions and would be able to consistently achieve the advertised electric-only range. And Plaintiffs reasonably expected that their Vehicles would provide adequate and reliable acceleration.

621. The Vehicles had less than 100,000 miles and was still covered by the implied warranty when the Vehicles were acquired by Plaintiffs and the Vehicles were defective at that time. Moreover, the Vehicles had less than 100,000 miles and were still covered by the implied warranty when FCA failed to provide an adequate repair or replacement for the Battery Defect and FORM Defect within a reasonable time.

622. As a result of the Battery Defect and FORM Defect, Plaintiffs suffered an ascertainable loss resulting from FCA's concealment, fraud, omissions, and refusal to correct the Defective Battery and FORM Defect and did not receive the benefit of the bargain after purchasing the Vehicles. Had Plaintiffs known that the Vehicles presented a risk of a catastrophic fire and suffered from the FORM Defect, they would not have purchased the Vehicles or would have paid substantially less for them.

623. At the time of the purchase, Plaintiffs were unaware that their Vehicles had the Battery Defect and FORM Defect. Had Plaintiffs known the true facts about their Vehicles, Plaintiffs would not have purchased the Vehicles or would have paid substantially less for them.

Because Plaintiffs were unaware of the defects, Plaintiffs suffered overpayment damages at the time of the acquisitions and suffered incidental, consequential and actual damages after the Vehicle's acquisitions.

**FCA issued a series of ineffective recalls of the**
**Defective Vehicles as a result of the Battery Defect**

624. Despite FCA's actual and/or constructive knowledge of the serious risk of explosion and fire in the Defective Vehicles, it did nothing to remedy the problem or even warn consumers until its November 2023 recall.

625. According to the 2023 Recall Part 573 Recall Report that FCA sent to NHTSA on November 22, 2023, FCA's Technical Safety and Regulatory Compliance organization began investigating fire risk from the HV battery pack after receiving numerous reports of fires. By October 2023, FCA had conducted "two vehicle buybacks and . . . disassembled the HV battery packs. The modules and cells are undergoing additional analysis." FCA still has not disclosed the results of any such analysis. Finally, on November 22, 2023, FCA's Vehicle Regulations Committee decided "to conduct a voluntary safety recall" of the Defective Vehicles. The 2023 Recall, however, did not provide any fix for the Battery Defect. Four months later, FCA announced an attempted recall procedure in March 2024. But even after those months of delay, FCA admitted that it still had not identified the root cause of the Battery Defect.

626. Nevertheless, FCA self-servingly predicted in its communications with dealers that, "Very few vehicles [an estimated one percent] are expected to require HV battery replacement." FCA's rosy prediction for its 2023 Recall was off the mark. Defective Vehicles failed the recall procedure in unexpectedly high numbers. One online poll on a Jeep 4xe forum found that nearly half of respondents needed a replacement HV battery, with all but one still waiting on their battery at the time they responded to the poll.

627. According to FCA's final Quarterly Report to NHTSA regarding its 2023 Recall, as of July 26, 2024, roughly half of a "recall population of 32,125" vehicles actually received recall service. Unsurprisingly, given the large number of vehicles that ultimately failed recall service, consumers have reported waiting for months on end for their replacement HV Battery on various Jeep forums.

628. FCA Recall B9A was announced in November 2023. It applied to 2021-2023 Jeep Wrangler PHEVs. According to the recall notice, an internally failed HV battery could lead to a vehicle fire. Owners were instructed to refrain from charging their vehicles and to not park their vehicles near buildings, structures or other vehicles. At the time of the recall notice, the approved remedy, a software flash, was not available. The initial recall applied to approximately 32,000 vehicles.

629. In September 2024, FCA issued Recall 95B. The recall applied to 2020-2024 Jeep Wrangler PHEVs and 2022-2024 Jeep Grand Cherokee PHEVs. The new recall applied to subject vehicles even if they had already received the Recall B9A repair. According to FCA, the most likely root cause of the defective batteries in the Defective Vehicles was separator damage. At the time of the recall notice, the approved remedy, a software flash, was not available. The 2024 recall applied to approximately 154,000 vehicles.

630. In October 2025, FCA issued Recall 68C. The recall applied to 2020-2025 Jeep Wrangler PHEVs and 2022-2026 Jeep Grand Cherokee PHEVs. The new recall applied to subject vehicles even if they had already received the Recall B9A repair or the Recall 95B repair. At the time of the recall notice, the approved remedy, a software flash, was not available.

631. As FCA floundered in performing the various recalls, it continued to advise the Defective Vehicle owners and lessees "to refrain from recharging these vehicles and not to park

them inside of buildings or structures, or near other vehicles until the vehicle has the final repair completed." These instructions left the Defective Vehicle owners with three choices: (i) follow FCA's instructions, if possible, at the great inconvenience of parking far from home and the expense and environmental impact of additional consumption of gasoline (and potentially degrading their HV Batteries further by not charging them as per FCA's use guidelines); (ii) ignore FCA's instructions and risk disaster; or (iii) sell the vehicles at a substantial loss as a result of FCA's conduct.

**FCA has failed to remedy the FORM Defect**

632. Despite its longstanding knowledge of the FORM defect, FCA has failed to act to notify all Vehicle owners of its omissions, remedy its misrepresentations regarding the FORM Defect or implement a recall to remedy or eliminate the FORM Defect. In fact, it appears that FCA has only issued one TSB directly referencing the FORM Defect. Dated December 23, 2022, FCA's TSB only applies to 2022 Jeep Wrangler 4xe vehicles and is meant to address the following customer complaints: "Vehicle may not be able to enter electric mode driving while Fuel Oil Refresh Mode (FORM) is active[,]" and/or "FORM staying on too long." The TSB instructs dealer technicians to update the 2022 Jeep Wrangler 4xe's powertrain control module (PCM), the hybrid control processor (HCP), the auxiliary hybrid control processor (AHCP) also known as the Power Inverter Module (PIM), and the Transmission Control Module (TCM). On information and belief, application of these updates has proved ineffective in remedying or ameliorating the FORM Defect.

633. FCA later issued a Customer Satisfaction Notification directed toward certain 2023 Jeep Wrangler 4xe owners. The Customer Satisfaction Notification instructs 2023 Jeep Wrangler

4xe owners to visit a dealership because "[t]he full electric mode on your vehicle may not be available due to an incorrectly enabled engine maintenance mode designed to protect your engine from failure due to diluted oil." The notification makes no mention of FORM, the conditions that may trigger it, or how the stated solution will remedy the problem. Rather than reveal the true nature and extent of the FORM Defect or implement a recall to remedy it, FCA has continued to conceal the extent of the problem.

## FCA's Implied Warranties

634. Plaintiffs purchased their Vehicles from FCA's network of authorized dealers who were authorized sellers and distributors of the Defective Vehicles. Those dealers were and are FCA's authorized representatives for service and repair, including warranty repairs, of the subject vehicles. FCA intends for the dealers to sell its vehicles to consumers like Plaintiffs and the contracts between FCA and its authorized dealers, including the warranties, are made for the express benefit of the ultimate purchasers of the subject vehicles and not for the dealers. As a result, consumers, not FCA's dealers, are the intended third-party beneficiaries of all implied warranties between FCA and its dealers relating to the subject vehicles and those warranties are designed solely for the benefit of the ultimate consumers of the subject vehicles.

635. An implied warranty of merchantability also accompanied the sale and lease of the vehicles by operation of law under the UCC and Texas law.

636. Pursuant to the implied warranty, FCA warranted the Vehicles were merchantable under both the UCC and Texas law Act. A merchantable electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable vehicle can be safely used without a risk of an underhood fire.

637. FCA does not sell vehicles directly to consumers such as Plaintiffs but rather only through its authorized FCA dealers. Plaintiffs acquired the Vehicles from authorized FCA dealers.

638. FCA also does not directly provide the repairs or other services called for under the terms of FCA's warranties. Instead, FCA uses its authorized FCA dealers to both provide warranties to consumers who purchase or lease FCA vehicles and to perform repairs or other services under the terms of FCA's warranties.

639. As intended and directed by FCA, FCA's implied warranties were provided to Plaintiffs, the ultimate consumers, at the time they took delivery of his Vehicles and as part of the basis of the bargain. The sale of the Vehicle by FCA's authorized dealer created a direct transactional relationship between FCA and Plaintiffs. Since FCA provided an implied warranty to the ultimate consumer with the purchase or lease of the vehicle no further "privity of contract" is required to enforce the implied warranty. When deciding to acquire the Vehicles, Plaintiffs relied on FCA's implied warranty that the Vehicles.

640. Additionally and alternatively, Plaintiffs may enforce FCA's implied warranty of merchantability as an intended third-party beneficiary. The implied warranty of merchantability was and is intended solely for the benefit of Plaintiff, the owner of the Vehicle. Plaintiffs were and are the intended third-party beneficiary of those implied warranties. The dealers from whom they purchased the Vehicles were not intended to be the ultimate consumer of the subject Vehicles and had no rights under the implied warranty applying to the Vehicles.

641. The implied warranties applicable to the subject Vehicles were intended for the benefit of the ultimate purchasers and owners of the vehicles. The implied warranties are applicable to original or subsequent owners and are transferrable from owner to owner.

642. The dealers from whom Plaintiffs purchased the subject Vehicles were not intended to be the ultimate consumer of the subject Vehicles, were not the intended beneficiary of the implied warranties applying to the Vehicles and had no rights under those warranties. Rather, the implied warranties were intended to benefit the ultimate consumers only.

## CAUSES OF ACTION

## MARYLAND CAUSES OF ACTION

### FIRST CAUSE OF ACTION - BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301, ET SEQ. (THE "MMWA")

643. Maryland Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

644. Maryland Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

645. Maryland Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). FCA is a supplier and warrantor within the meaning of 15 U.S.C. §§ 2301(4)-(5). Maryland Plaintiffs' Vehicles are a "consumer product" within the meaning of 15 U.S.C. § 2301(1).

646. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Maryland at Md. Code Ann., Com. Law § 2-101 *et. seq.*

647. FCA is and was at all relevant times a "merchant" with respect to motor vehicles within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Maryland at Md. Code Ann., Com. Law § 2-101 *et. seq.*

648. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Maryland at Md. Code Ann., Com. Law § 2-314.

649. FCA provided Maryland Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

650. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage. The FORM Defect interfered with the acceleration and all-electric operation of the Vehicles.

651. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

652. The Defects were of such a character that when the Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and

others if not properly designed and fashioned. The Vehicles were therefore a "thing of danger" that made their use a likely source of danger to many people. As purchasers of Defective Vehicles, Maryland Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

653. Maryland Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with Maryland Plaintiffs.

654. Maryland Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. Maryland Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

655. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, from the federal class action complaint and directly from consumers, including Maryland Plaintiffs

656. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

657. Maryland Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to Maryland Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, increased gasoline costs

and various consequential damages including mental anguish damages. Maryland Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**SECOND CAUSE OF ACTION –**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

658. Maryland Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

659. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Maryland at Md. Code Ann., Com. Law § 2-101 *et. seq.*

660. FCA is and was at all relevant times a "merchant" with respect to motor vehicles within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Maryland at Md. Code Ann., Com. Law § 2-101 *et. seq.*

661. FCA provided Maryland Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

662. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing

reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage. The FORM Defect interfered with the all-acceleration and all-electric operation of the Vehicles.

663. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

664. The Defects were of such a character that when the Defective Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Defective Vehicles were therefore a "thing of danger" that made their use a likely source of danger to many people. As purchasers of Defective Vehicles, Maryland Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

665. Maryland Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with Maryland Plaintiffs.

666. Maryland Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. Maryland

Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

667. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, from the federal class action complaint and directly from consumers, including Maryland Plaintiffs

668. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

669. Maryland Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to Maryland Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles, increased gasoline costs and various consequential damages including mental anguish damages. Maryland Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**THIRD CAUSE OF ACTION -**
**FRAUDULENT CONCEALMENT/FRAUD BY OMISSION**

670. Maryland Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

671. FCA made material omissions regarding the Defective Vehicles and their batteries, actively concealed the Defective Batteries and made material statements of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA failed to disclose that the Defective Vehicles could only

provide the promised 49 eMPG in all-electric mode, a mode which would render them unsafe and prone to fire. FCA also failed to disclose the existence of the Battery Defect and the FORM Defect. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

672. Under Maryland law, a defendant has a duty to disclose under the following circumstances: (a) where a person voluntarily discloses information, the whole truth must be disclosed; (b) when a person makes a representation and new information makes that earlier misrepresentation misleading or untrue; and (c) when a person makes a partial disclosure and conveys a false impression. Here, FCA voluntarily disclosed the all-electric range and eMPG of the subject vehicles in advertisements and other materials and yet did not disclose the whole truth by revealing that the advertised all-electric range and eMPG could only be reached by fully charging the vehicles and subjecting the owners to an unreasonable risk of a battery-related fire or that the FORM Defect would prevent the Vehicles from operating safely or in all-electric mode.

673. Moreover, even if FCA's representations regarding the vehicle's electric range and eMPG were true when made, FCA's discovery of the Battery Defect and FORM Defect made its earlier representations misleading or untrue. Finally, FCA's representations about the vehicle's electric range and eMPG were a partial disclosure that conveyed a false impression since the advertised range could only be achieved by subjecting Maryland Plaintiffs' vehicles to an unreasonable risk of a battery-related fire and could often not be achieved at all as a result of the FORM Defect. Under these facts, FCA had a duty to disclose the Defects and the effects thereof.

674. In addition, FCA had a duty to disclose these omitted material facts because they were known and/or accessible only to FCA, which had superior knowledge and access to the facts, and FCA knew they were not known to or reasonably discoverable by Maryland Plaintiffs. The

facts FCA omitted from its representations were material because they directly impacted the Subject Vehicles' safety and reliability.

675. FCA also had a duty to disclose because it was in exclusive control of the material facts and such facts were not known to the public or the Maryland Plaintiffs. FCA possessed exclusive knowledge of the Battery Defect and FORM Defect.

676. FCA also had a duty to disclose because it actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Maryland Plaintiffs to purchase the Subject Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

677. Maryland Plaintiffs were unaware of the omitted and concealed material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of Maryland Plaintiffs were justified and Maryland Plaintiffs reasonably relied on FCA's omissions and suffered damages as a result.

678. As a result of FCA's omissions and concealments, Maryland Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of purchase, out of pocket costs, and various consequential damages including mental anguish damages.

679. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Maryland Plaintiffs. FCA's' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**FOURTH CAUSE OF ACTION -**
**FRAUD BY AFFIRMATIVE MISREPRESENTATION**

680. Maryland Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

681. FCA made material misrepresentations regarding the Defective Vehicles and their batteries, actively concealed the Battery Defect and FORM Defect and made material statements of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA falsely represented the electric range and eMPG of the Defective Vehicles. FCA also misrepresented the utility of the Defective Vehicles in cold weather.

682. Maryland Plaintiffs reasonably relied on FCA's misrepresentations and suffered damages as a result. As a result of FCA's fraud, Maryland Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of purchase, out of pocket costs, and various consequential damages including mental anguish damages.

683. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Maryland Plaintiffs. FCA's' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**FIFTH CAUSE OF ACTION-**
**VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT**
**MD. CODE ANN., COM. LAW § 13-101 ET SEQ.)**

684. Maryland Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

685. The Maryland Consumer Protection Act (Maryland CPA) provides that a person may not engage in any unfair or deceptive trade practice in the sale or lease of any consumer good, including "failure to state a material fact if the failure deceives or tends to deceive" and "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same," MD. CODE ANN., COM. LAW § 13-301, regardless of whether the consumer is actually deceived or damaged, MD. CODE ANN., COM. LAW § 13-302. FCA's aforementioned conduct violated this statute.

686. FCA and Maryland Plaintiffs are "persons" within the meaning of MD. CODE ANN., COM. LAW § 13-101(h).

687. In the course of doing business, FCA misrepresented material facts concerning the Subject Vehicles, including their all-electric range and eMPG. In the course of doing business, FCA also knowingly failed to disclose, suppressed, concealed, suppressed and/or omitted material facts regarding the Battery Defect and FORM Defect and the safety hazards associated with them, and misrepresented the standard, quality or grade of the Subject Vehicles, which directly caused harm to Maryland Plaintiffs. Moreover, FCA actively suppressed the fact that the batteries were defective and presented a safety hazard because of materials, workmanship and/or manufacturing defects. Instead of admitting the fundamental defect with the batteries, FCA rolled out a series

of ineffective software updates in an attempt to conceal the extent of the Battery Defect and avoid the cost of battery replacements in the Defective Vehicles.

688. FCA thus violated the Maryland CPA by, at minimum by: (1) representing that the Subject Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Subject Vehicles are of a particular standard and quality when they are not; (3) advertising the Subject Vehicles with the intent not to sell them as advertised; (4) willfully using, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact; (5) willfully failing to state a material fact, or the willfully concealing, suppressing or omitting a material fact; and (6) otherwise engaging in an unconscionable act or practice in connection with a consumer transaction.

689. FCA knowingly and intentionally misrepresented and omitted material facts regarding the Subject Vehicles, intending for Maryland Plaintiffs to rely on these material misrepresentations and omissions when choosing to purchase or lease a Subject Vehicle instead of vehicles marketed and sold by its competitors.

690. Maryland Plaintiffs relied on these material misrepresentations and, as a result, are entitled to damages in an amount to be proven at trial.

691. FCA had a duty to Maryland Plaintiffs to disclose the Battery Defect and FORM Defect and the defective nature of the Subject Vehicles because:

a. FCA possessed exclusive knowledge that it was manufacturing, selling, and distributing vehicles throughout the United States that contained the defects;

b. Maryland Plaintiffs could not reasonably have been expected to learn or discover that the Subject Vehicles had these defects;

c. FCA knew that Maryland Plaintiffs could not reasonably have been expected to learn about or discover the defects on their own.

692. In failing to disclose the defects and their resulting safety risks and efficiency decreases, FCA has knowingly and intentionally concealed and omitted material facts and breached its duty to disclose.

693. The facts FCA concealed or did not disclose to Maryland Plaintiffs are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Subject Vehicles or pay a lesser price. Had Maryland Plaintiffs known the Subject Vehicles were defective, they would not have purchased the Subject Vehicles or would have paid less for them.

694. FCA's violations present a continuing risk to Maryland Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

695. The recalls and modifications FCA has instituted to address the defects have not been adequate to address or remedy the defects.

696. Maryland Plaintiffs suffered ascertainable loss directly and proximately resulting from FCA's Maryland CPA violations. Maryland Plaintiffs have suffered actual damages and/or injury in fact, including, inter alia, the difference in value between the Subject Vehicles promised and warranted, and the Subject Vehicles as sold.

697. As a direct and proximate result of FCA's unfair or deceptive acts or practices, the Maryland Plaintiffs have suffered and will continue to suffer actual damages, including economic damages at the point of sale or lease and/or diminished value of their Vehicles. Had the Maryland Plaintiffs known that the Vehicles would be plagued by the Defects, they would not have purchased or leased the Vehicles or would have paid substantially less to purchase or lease them.

698. Pursuant to MD. CODE ANN., COM. LAW § 13-408, the Maryland Plaintiffs seek actual damages, punitive damages, attorneys' fees and costs, and any other just and proper relief available under the Maryland CPA.

**SIXTH CAUSE OF ACTION-**
**UNJUST ENRICHMENT**

699. Maryland Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

700. FCA is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the Battery Defect and FORM Defect in the Defective Vehicles, but nevertheless marketed them for sale to consumers, and misled Maryland Plaintiffs regarding the nature and quality of the Defective Vehicles while profiting from this deception.

701. FCA failed to adequately research, design, test, and manufacture the Defective Vehicles before warranting, promoting, selling and distributing the Defective Vehicles as suitable and safe for reasonably foreseeable uses.

702. At the expense of Maryland Plaintiffs, FCA received and retained a benefit from Plaintiffs and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Defective Vehicles to Maryland Plaintiffs and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Defective Vehicles to Maryland Plaintiffs for more than they were worth as a result of FCA's conduct.

703. Maryland Plaintiffs would not have purchased or leased the Defective Vehicles, or would have paid less for them, had they known of the Battery Defect or FORM Defect at the time of purchase or lease. Therefore, FCA profited from the sale and lease of the Defective Vehicles to the detriment and expense of Maryland Plaintiffs.

704. Maryland Plaintiffs conferred tangible and material economic benefits upon FCA when they purchased or leased the Defective Vehicles.

705. FCA knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of FCA acting in its pecuniary interest at the expense of its customers. It is inequitable, unconscionable, and unjust for FCA to retain these benefits.

706. As a licensed distributor of new motor vehicles, FCA sold the Defective Vehicles to Maryland Plaintiffs through its network of authorized dealers across the United States. FCA profited from the sale of the Defective Vehicles, including sales made through its dealership network and sales brokered through its financing and leasing arms. FCA also benefitted from the sale of the Defective Vehicles as a result of the resulting service and warranty work performed on the Defective Vehicles.

707. Maryland Plaintiffs were not aware of the true facts about the Defective Vehicles when they acquired them and did not benefit from FCA's conduct.

708. There is no justification for FCA's unjust enrichment. It would be inequitable, unconscionable, and unjust for FCA to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

709. Maryland Plaintiffs are entitled to restitution of the benefits FCA unjustly retained and/or any amounts necessary to return Maryland Plaintiffs to the position they occupied prior to dealing with FCA.

710. Maryland Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

## ARIZONA CAUSES OF ACTION

### FIRST CAUSE OF ACTION - BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301, ET SEQ. (THE "MMWA")

711. Arizona Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

712. Arizona Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

713. Arizona Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). FCA is a supplier and warrantor within the meaning of 15 U.S.C. §§ 2301(4)-(5). Arizona Plaintiffs' Vehicles are a "consumer product" within the meaning of 15 U.S.C. § 2301(1).

714. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Arizona at Ariz. Rev. Stat. § 47-2101 *et. seq.*

715. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Ariz. Rev. Stat. § 47-2101 *et. seq.*

716. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Arizona at Ariz. Rev. Stat. § 47-2314 *et. seq.*

717. FCA provided Arizona Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty

that the Vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

718. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage. The FORM Defect interfered with the acceleration and all-electric operation of the Vehicles.

719. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

720. The Defects were of such a character that when the Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Vehicles were therefore a “thing of danger” that made their use a likely source of danger to many people. As purchasers of Defective Vehicles, Arizona Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

721. Arizona Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with Arizona Plaintiffs.

722. Arizona Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. Arizona Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

723. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, from the federal class action complaint and directly from consumers, including Plaintiffs.

724. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

725. Arizona Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to Arizona Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, increased gasoline costs and various consequential damages including mental anguish damages. Arizona Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

## SECOND CAUSE OF ACTION – BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

726. Arizona Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

727. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Arizona at Ariz. Rev. Stat. § 47-2101 *et. seq.*

728. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Ariz. Rev. Stat. § 47-2101 *et. seq.*

729. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Arizona at Ariz. Rev. Stat. § 47-2314 *et. seq.*

730. FCA provided Arizona Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

731. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the

restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage. The FORM Defect interfered with the all-acceleration and all-electric operation of the Vehicles.

732. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

733. The Defects were of such a character that when the Defective Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Defective Vehicles were therefore a "thing of danger" that made their use a likely source of danger to many people. As purchasers of Defective Vehicles, Arizona Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

734. Arizona Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with Plaintiffs.

735. Arizona Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. Arizona Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

736. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, from the federal class action complaint and directly from consumers, including Arizona Plaintiffs.

737. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

738. Arizona Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to Arizona Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, increased gasoline costs and various consequential damages including mental anguish damages. Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**THIRD CAUSE OF ACTION -**
**FRAUDULENT CONCEALMENT/FRAUD BY OMISSION**

739. Arizona Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

740. FCA made material omissions regarding the Defective Vehicles and their batteries, actively concealed the Defective Batteries and made material statements of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA failed to disclose that the Defective Vehicles could only provide the promised 49 eMPG in all-electric mode, a mode which would render them unsafe and prone to fire. FCA also failed to disclose the existence of the Battery Defect and the FORM Defect. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

741. Under Arizona law, a defendant has a duty to disclose under the following circumstances: (a) where a person voluntarily discloses information, the whole truth must be disclosed; (b) when a person makes a representation and new information makes that earlier misrepresentation misleading or untrue; and (c) when a person makes a partial disclosure and conveys a false impression. Here, FCA voluntarily disclosed the all-electric range and eMPG of the subject vehicles in advertisements and other materials and yet did not disclose the whole truth by revealing that the advertised all-electric range and eMPG could only be reached by fully charging the vehicles and subjecting the owners to an unreasonable risk of a battery-related fire or that the FORM Defect would prevent the Vehicles from operating safely or in all-electric mode.

742. Moreover, even if FCA's representations regarding the vehicle's electric range and eMPG were true when made, FCA's discovery of the Battery Defect and FORM Defect made its earlier representations misleading or untrue. Finally, FCA's representations about the vehicle's electric range and eMPG were a partial disclosure that conveyed a false impression since the advertised range could only be achieved by subjecting Arizona Plaintiffs' vehicles to an unreasonable risk of a battery-related fire and could often not be achieved at all as a result of the FORM Defect. Under these facts, FCA had a duty to disclose the Defects and the effects thereof.

743. In addition, FCA had a duty to disclose these omitted material facts because they were known and/or accessible only to FCA, which had superior knowledge and access to the facts, and FCA knew they were not known to or reasonably discoverable by Arizona Plaintiffs. The facts FCA omitted from its representations were material because they directly impacted the Subject Vehicles' safety and reliability.

744. FCA also had a duty to disclose because it was in exclusive control of the material facts and such facts were not known to the public or the Arizona Plaintiffs. FCA possessed exclusive knowledge of the Battery Defect and FORM Defect.

745. FCA also had a duty to disclose because it actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Arizona Plaintiffs to purchase the Subject Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

746. Arizona Plaintiffs were unaware of the omitted and concealed material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of Arizona Plaintiffs were justified and Arizona Plaintiffs reasonably relied on FCA's omissions and suffered damages as a result.

747. As a result of FCA's omissions and concealments, Arizona Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of purchase, out of pocket costs, and various consequential damages including mental anguish damages.

748. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Arizona Plaintiffs. FCA's' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**FOURTH CAUSE OF ACTION -**
**FRAUD BY AFFIRMATIVE MISREPRESENTATION**

749. Arizona Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

750. FCA made material misrepresentations regarding the Defective Vehicles and their batteries, actively concealed the Battery Defect and FORM Defect and made material statements

of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA falsely represented the electric range and eMPG of the Defective Vehicles. FCA also misrepresented the utility of the Defective Vehicles in cold weather.

751. Arizona Plaintiffs reasonably relied on FCA's misrepresentations and suffered damages as a result. As a result of FCA's fraud, Arizona Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of purchase, out of pocket costs, and various consequential damages including mental anguish damages.

752. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Arizona Plaintiffs. FCA's' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**FIFTH CAUSE OF ACTION-**
**VIOLATION OF THE ARIZONA CONSUMER FRAUD ACT**
**(ARIZ. REV. STAT. § 44-1521, ET SEQ.)**

753. Arizona Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

754. Arizona Plaintiffs have complied with all applicable pre-suit notice letter provisions, if any.

755. Arizona Plaintiffs and FCA are "persons" within the meaning of the Arizona Consumer Fraud Act ("Arizona CFA"), Ariz. Rev. Stat. § 44-1521(6).

756. The Vehicles are "merchandise" within the meaning of Ariz. Rev. Stat. § 44-1521(5).

757. The Arizona CFA provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, … misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale … of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." Ariz. Rev. Stat. § 44-1522(A). Defendants intentionally violated the Arizona CFA.

758. In the course of doing business, FCA misrepresented material facts concerning the Subject Vehicles, including their all-electric range and eMPG. In the course of doing business, FCA also knowingly failed to disclose, suppressed, concealed, suppressed and/or omitted material facts regarding the Battery Defect and FORM Defect and the safety hazards associated with them, and misrepresented the standard, quality or grade of the Subject Vehicles, which directly caused harm to Arizona Plaintiffs. Moreover, FCA actively suppressed the fact that the batteries were defective and presented a safety hazard because of materials, workmanship and/or manufacturing defects. Instead of admitting the fundamental defect with the batteries, FCA rolled out a series of ineffective software updates in an attempt to conceal the extent of the Battery Defect and avoid the cost of battery replacements in the Defective Vehicles.

759. FCA thus violated the Arizona CFA by, at minimum by: (1) representing that the Subject Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Subject Vehicles are of a particular standard and quality when they are not; (3) advertising the Subject Vehicles with the intent not to sell them as advertised; (4) willfully using, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact; (5) willfully failing to state a material fact, or the willfully concealing,

suppressing or omitting a material fact; and (6) otherwise engaging in an unconscionable act or practice in connection with a consumer transaction.

760. FCA knowingly and intentionally misrepresented and omitted material facts regarding the Subject Vehicles, intending for Arizona Plaintiffs to rely on these material misrepresentations and omissions when choosing to purchase or lease a Subject Vehicle instead of vehicles marketed and sold by its competitors.

761. Arizona Plaintiffs relied on these material misrepresentations and, as a result, are entitled to damages in an amount to be proven at trial.

762. FCA had a duty to Arizona Plaintiffs to disclose the Battery Defect and FORM Defect and the defective nature of the Subject Vehicles because:

a. FCA possessed exclusive knowledge that it was manufacturing, selling, and distributing vehicles throughout the United States that contained the defects;

b. Arizona Plaintiffs could not reasonably have been expected to learn or discover that the Subject Vehicles had these defects;

c. FCA knew that Arizona Plaintiffs could not reasonably have been expected to learn about or discover the defects on their own.

763. In failing to disclose the defects and their resulting safety risks and efficiency decreases, FCA has knowingly and intentionally concealed and omitted material facts and breached its duty to disclose.

764. The facts FCA concealed or did not disclose to Arizona Plaintiffs are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Subject Vehicles or pay a lesser price. Had Arizona Plaintiffs known the Subject

Vehicles were defective, they would not have purchased the Subject Vehicles or would have paid less for them.

765. FCA's violations present a continuing risk to Arizona Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

766. The recalls and modifications FCA has instituted to address the defects have not been adequate to address or remedy the defects.

767. FCA's violative practices were specifically designed to induce, and did in fact induce, to purchase or lease their Vehicles.

768. Arizona Plaintiffs reasonably relied on FCA's material misrepresentations and omissions concerning the Vehicles, and their transmissions.

769. Upon information and belief, these violations were not due to a bona fide error, as FCA failed to have any procedures in place designed to prevent the violations, and engaged in the same unfair and deceptive acts or practices in connection with the sale or lease of numerous other vehicles.

770. As a direct and proximate result of FCA's unfair or deceptive acts or practices, Arizona Plaintiffs have suffered and will continue to suffer actual damages, including economic damages at the point of sale or lease and/or diminished value of their Vehicles. Had the Arizona Plaintiffs known that the Vehicles would be plagued by the defects described above, they would not have purchased or leased the Vehicles or would have paid substantially less to purchase or lease them.

771. As a result of the Defects, Arizona Plaintiffs were harmed and suffered actual damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of

purchase, out of pocket costs, and various consequential damages including mental anguish damages.

772. FCA had an ongoing duty to all customers to refrain from unfair and deceptive practices under the Arizona CFA in the course of their business.

773. FCA's violations present a continuing risk to the Arizona Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

774. Arizona Plaintiffs hereby sue FCA for actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) in an amount to be determined at trial. Arizona Plaintiffs also sue FCA for punitive damages because FCA engaged in aggravated and outrageous conduct with an evil mind. Arizona Plaintiffs also sue Defendants for attorneys' fees and costs and any other just and proper relief available under the Arizona CFA.

**SIXTH CAUSE OF ACTION-**
**UNJUST ENRICHMENT**

775. Arizona Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

776. FCA is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the Battery Defect and FORM Defect in the Defective Vehicles, but nevertheless marketed them for sale to consumers, and misled Arizona Plaintiffs regarding the nature and quality of the Defective Vehicles while profiting from this deception.

777. FCA failed to adequately research, design, test, and manufacture the Defective Vehicles before warranting, promoting, selling and distributing the Defective Vehicles as suitable and safe for reasonably foreseeable uses.

778. At the expense of Arizona Plaintiffs, FCA received and retained a benefit from Arizona Plaintiffs and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Defective Vehicles to Arizona Plaintiffs and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Defective Vehicles to Arizona Plaintiffs for more than they were worth as a result of FCA's conduct.

779. Arizona Plaintiffs would not have purchased or leased the Defective Vehicles, or would have paid less for them, had they known of the Battery Defect or FORM Defect at the time of purchase or lease. Therefore, FCA profited from the sale and lease of the Defective Vehicles to the detriment and expense of Arizona Plaintiffs.

780. Arizona Plaintiffs conferred tangible and material economic benefits upon FCA when they purchased or leased the Defective Vehicles.

781. FCA knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of FCA acting in its pecuniary interest at the expense of its customers. It is inequitable, unconscionable, and unjust for FCA to retain these benefits.

782. As a licensed distributor of new motor vehicles, FCA sold the Defective Vehicles to Arizona Plaintiffs through its network of authorized dealers across the United States. FCA profited from the sale of the Defective Vehicles, including sales made through its dealership network and sales brokered through its financing and leasing arms. FCA also benefitted from the sale of the Defective Vehicles as a result of the resulting service and warranty work performed on the Defective Vehicles.

783. Arizona Plaintiffs were not aware of the true facts about the Defective Vehicles when they acquired them and did not benefit from FCA's conduct.

784. There is no justification for FCA's unjust enrichment. It would be inequitable, unconscionable, and unjust for FCA to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

785. Arizona Plaintiffs are entitled to restitution of the benefits FCA unjustly retained and/or any amounts necessary to return Arizona Plaintiffs to the position they occupied prior to dealing with FCA.

786. Arizona Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

## TENNESSEE CAUSES OF ACTION

### FIRST CAUSE OF ACTION - BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301, ET SEQ. (THE "MMWA")

787. Tennessee Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

788. Tennessee Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). FCA is a supplier and warrantor within the meaning of 15 U.S.C. §§ 2301(4)-(5). Tennessee Plaintiffs' Vehicles are a "consumer product" within the meaning of 15 U.S.C. § 2301(1).

789. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Tennessee at Tenn. Code Ann. § 47-2-101 *et. seq.*

790. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Tenn. Code Ann. § 47-2-101 *et. seq.*

791. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Tennessee at Tenn. Code Ann. § 47-2-314 *et. seq.*

792. FCA provided Tennessee Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

793. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage. The FORM Defect interfered with the all-acceleration and all-electric operation of the Vehicles.

794. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent

and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

795. The Defects were of such a character that when the Defective Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Defective Vehicles were therefore a "thing of danger" that made their use a likely source of danger to many people. As purchasers of Defective Vehicles, Tennessee Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

796. Tennessee Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with Tennessee Plaintiffs.

797. Tennessee Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. Tennessee Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

798. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, from the federal class action complaint and directly from consumers, including Tennessee Plaintiffs

799. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

800. Tennessee Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to Tennessee Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, increased gasoline costs and various consequential damages including mental anguish damages. Tennessee Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**SECOND CAUSE OF ACTION –**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

801. Tennessee Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

802. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Tennessee at Tenn. Code Ann. § 47-2-101 *et. seq.*

803. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Tenn. Code Ann. § 47-2-101 *et. seq.*

804. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Tennessee at Tenn. Code Ann. § 47-2-314 *et. seq.*

805. FCA provided Tennessee Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the

Vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

806. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage. The FORM Defect interfered with the all-acceleration and all-electric operation of the Vehicles.

807. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

808. The Defects were of such a character that when the Defective Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Defective Vehicles were therefore a "thing of danger" that made their use a likely source of danger to many people. As purchasers of Defective Vehicles, Tennessee Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

809. Tennessee Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with Tennessee Plaintiffs.

810. Tennessee Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. Tennessee Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

811. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, from the federal class action complaint and directly from consumers, including Tennessee Plaintiffs

812. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

813. Tennessee Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to Tennessee Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, increased gasoline costs and various consequential damages including mental anguish damages. Tennessee Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**THIRD CAUSE OF ACTION -**
**FRAUDULENT CONCEALMENT/FRAUD BY OMISSION**

814. Tennessee Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

815. FCA made material omissions regarding the Defective Vehicles and their batteries, actively concealed the Defective Batteries and made material statements of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA failed to disclose that the Defective Vehicles could only provide the promised 49 eMPG in all-electric mode, a mode which would render them unsafe and prone to fire. FCA also failed to disclose the existence of the Battery Defect and the FORM Defect. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

816. Under Tennessee law, a defendant has a duty to disclose under the following circumstances: (a) where a person voluntarily discloses information, the whole truth must be disclosed; (b) when a person makes a representation and new information makes that earlier misrepresentation misleading or untrue; and (c) when a person makes a partial disclosure and conveys a false impression. Here, FCA voluntarily disclosed the all-electric range and eMPG of the subject vehicles in advertisements and other materials and yet did not disclose the whole truth by revealing that the advertised all-electric range and eMPG could only be reached by fully charging the vehicles and subjecting the owners to an unreasonable risk of a battery-related fire or that the FORM Defect would prevent the Vehicles from operating safely or in all-electric mode.

817. Moreover, even if FCA's representations regarding the vehicle's electric range and eMPG were true when made, FCA's discovery of the Battery Defect and FORM Defect made its earlier representations misleading or untrue. Finally, FCA's representations about the vehicle's

electric range and eMPG were a partial disclosure that conveyed a false impression since the advertised range could only be achieved by subjecting Tennessee Plaintiffs' vehicles to an unreasonable risk of a battery-related fire and could often not be achieved at all as a result of the FORM Defect. Under these facts, FCA had a duty to disclose the Defects and the effects thereof.

818. In addition, FCA had a duty to disclose these omitted material facts because they were known and/or accessible only to FCA, which had superior knowledge and access to the facts, and FCA knew they were not known to or reasonably discoverable by Tennessee Plaintiffs. The facts FCA omitted from its representations were material because they directly impacted the Subject Vehicles' safety and reliability.

819. FCA also had a duty to disclose because it was in exclusive control of the material facts and such facts were not known to the public or the Tennessee Plaintiffs. FCA possessed exclusive knowledge of the Battery Defect and FORM Defect.

820. FCA also had a duty to disclose because it actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Tennessee Plaintiffs to purchase the Subject Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

821. Tennessee Plaintiffs were unaware of the omitted and concealed material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of Tennessee Plaintiffs were justified and Tennessee Plaintiffs reasonably relied on FCA's omissions and suffered damages as a result.

822. As a result of FCA's omissions and concealments, Tennessee Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of purchase, out of pocket costs, and various consequential damages including mental anguish damages.

823. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Tennessee Plaintiffs. FCA's' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**FOURTH CAUSE OF ACTION -**
**FRAUD BY AFFIRMATIVE MISREPRESENTATION**

824. Tennessee Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

825. FCA made material misrepresentations regarding the Defective Vehicles and their batteries, actively concealed the Battery Defect and FORM Defect and made material statements of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA falsely represented the electric range and eMPG of the Defective Vehicles. FCA also misrepresented the utility of the Defective Vehicles in cold weather.

826. Tennessee Plaintiffs reasonably relied on FCA's misrepresentations and suffered damages as a result. As a result of FCA's fraud, Tennessee Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of purchase, out of pocket costs, and various consequential damages including mental anguish damages.

827. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Tennessee Plaintiffs. FCA's' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**FIFTH CAUSE OF ACTION-**
**VIOLATIONS OF TENNESSEE CONSUMER PROTECTION ACT OF 1977**
**(Tenn. Code Ann. § 47-18-101, et seq.)**

828. Tennessee Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

829. The Tennessee Plaintiffs are "natural persons" and "consumers" within the meaning of Tenn. Code § 47-18-103(2). FCA is a "person" within the meaning of Tenn. Code § 47-18-103(9).

830. FCA is engaged in "trade" or "commerce" or "consumer transactions" within the meaning Tenn. Code § 47-18-103(9).

831. The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "unfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code § 47-18-104. The Tennessee CPA prohibits (1) causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods; (2) representing that goods have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have; (3) representing that goods are of a particular standard, quality or grade if they are of another; (4) advertising goods with intent not to sell them as advertised; (5) engaging in any other act or practice which is deceptive to the consumer or to any other person. Tenn. Code § 47-18-104(b)(2), (5), (7), (9), (27). Defendant intentionally violated the aforementioned provisions of the Tennessee CPA.

832. In the course of doing business, FCA misrepresented material facts concerning the Subject Vehicles, including their all-electric range and eMPG. In the course of doing business, FCA also knowingly failed to disclose, suppressed, concealed, suppressed and/or omitted material facts regarding the Battery Defect and FORM Defect and the safety hazards associated with them,

and misrepresented the standard, quality or grade of the Subject Vehicles, which directly caused harm to Tennessee Plaintiffs. Moreover, FCA actively suppressed the fact that the batteries were defective and presented a safety hazard because of materials, workmanship and/or manufacturing defects. Instead of admitting the fundamental defect with the batteries, FCA rolled out a series of ineffective software updates in an attempt to conceal the extent of the Battery Defect and avoid the cost of battery replacements in the Defective Vehicles.

833. FCA thus violated the Tennessee CPA by, at minimum by: (1) representing that the Subject Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Subject Vehicles are of a particular standard and quality when they are not; (3) advertising the Subject Vehicles with the intent not to sell them as advertised; (4) willfully using, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact; (5) willfully failing to state a material fact, or the willfully concealing, suppressing or omitting a material fact; and (6) otherwise engaging in an unconscionable act or practice in connection with a consumer transaction.

834. FCA knowingly and intentionally misrepresented and omitted material facts regarding the Subject Vehicles, intending for Tennessee Plaintiffs to rely on these material misrepresentations and omissions when choosing to purchase or lease a Subject Vehicle instead of vehicles marketed and sold by its competitors.

835. Tennessee Plaintiffs relied on these material misrepresentations and, as a result, are entitled to damages in an amount to be proven at trial.

836. FCA had a duty to Tennessee Plaintiffs to disclose the Battery Defect and FORM Defect and the defective nature of the Subject Vehicles because:

837. FCA possessed exclusive knowledge that it was manufacturing, selling, and distributing vehicles throughout the United States that contained the defects;

838. Tennessee Plaintiffs could not reasonably have been expected to learn or discover that the Subject Vehicles had these defects;

839. FCA knew that Tennessee Plaintiffs could not reasonably have been expected to learn about or discover the defects on their own.

840. In failing to disclose the defects and their resulting safety risks and efficiency decreases, FCA has knowingly and intentionally concealed and omitted material facts and breached its duty to disclose.

841. The facts FCA concealed or did not disclose to Tennessee Plaintiffs are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Subject Vehicles or pay a lesser price. Had Tennessee Plaintiffs known the Subject Vehicles were defective, they would not have purchased the Subject Vehicles or would have paid less for them.

842. FCA's violations present a continuing risk to Tennessee Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

843. The recalls and modifications FCA has instituted to address the defects have not been adequate to address or remedy the defects.

844. Tennessee Plaintiffs suffered ascertainable loss directly and proximately resulting from FCA's Tennessee CPA violations. Tennessee Plaintiffs have suffered actual damages and/or injury in fact, including, inter alia, the difference in value between the Subject Vehicles promised and warranted, and the Subject Vehicles as sold.

845. Pursuant to Tenn. Code § 47-18-109, the Tennessee Plaintiffs hereby sue Defendant for actual damages plus treble damages for willful and knowing violations, pursuant to § 47-18-109(a)(3), plus punitive damages plus attorneys' fees and costs per Tenn. Code § 47-18-109(e)(1), plus any other just and proper relief to the extent available under the Tennessee CPA.

**SIXTH CAUSE OF ACTION-**
**UNJUST ENRICHMENT**

846. Tennessee Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

847. FCA is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the Battery Defect and FORM Defect in the Defective Vehicles, but nevertheless marketed them for sale to consumers, and misled Tennessee Plaintiffs regarding the nature and quality of the Defective Vehicles while profiting from this deception.

848. FCA failed to adequately research, design, test, and manufacture the Defective Vehicles before warranting, promoting, selling and distributing the Defective Vehicles as suitable and safe for reasonably foreseeable uses.

849. At the expense of Tennessee Plaintiffs, FCA received and retained a benefit from Plaintiffs and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Defective Vehicles to Tennessee Plaintiffs and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Defective Vehicles to Tennessee Plaintiffs for more than they were worth as a result of FCA's conduct.

850. Tennessee would not have purchased or leased the Defective Vehicles, or would have paid less for them, had they known of the Battery Defect or FORM Defect at the time of

purchase or lease. Therefore, FCA profited from the sale and lease of the Defective Vehicles to the detriment and expense of Plaintiffs.

851. Tennessee Plaintiffs conferred tangible and material economic benefits upon FCA when they purchased or leased the Defective Vehicles.

852. FCA knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of FCA acting in its pecuniary interest at the expense of its customers. It is inequitable, unconscionable, and unjust for FCA to retain these benefits.

853. As a licensed distributor of new motor vehicles, FCA sold the Defective Vehicles to Tennessee Plaintiffs through its network of authorized dealers across the United States. FCA profited from the sale of the Defective Vehicles, including sales made through its dealership network and sales brokered through its financing and leasing arms. FCA also benefitted from the sale of the Defective Vehicles as a result of the resulting service and warranty work performed on the Defective Vehicles.

854. Tennessee Plaintiffs were not aware of the true facts about the Defective Vehicles when they acquired them and did not benefit from FCA's conduct.

855. There is no justification for FCA's unjust enrichment. It would be inequitable, unconscionable, and unjust for FCA to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

856. Tennessee Plaintiffs are entitled to restitution of the benefits FCA unjustly retained and/or any amounts necessary to return Tennessee Plaintiffs to the position they occupied prior to dealing with FCA.

857. Tennessee Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

## CALIFORNIA CAUSES OF ACTION

### FIRST CAUSE OF ACTION - BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301, ET SEQ. (THE "MMWA")

858. California Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

859. California Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). FCA is a supplier and warrantor within the meaning of 15 U.S.C. §§ 2301(4)-(5). California Plaintiffs' Vehicles are a "consumer product" within the meaning of 15 U.S.C. § 2301(1).

860. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by California at California Commercial Code §§ 2105(1) and 10103(a)(8).

861. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under California Commercial Code §§ 2104(1) and 10103(c), a "seller" of motor vehicles under § 2103(1)(d) and a "lessor" of motor vehicles under Cal. Com. Code § 10103(a)(16).

862. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code ("UCC"), as adopted by California at California Commercial Code §§ 2314 and 10212.

863. FCA provided California Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the

Vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

864. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage. The FORM Defect interfered with the all-acceleration and all-electric operation of the Vehicles.

865. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

866. The Defects were of such a character that when the Defective Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Defective Vehicles were therefore a “thing of danger” that made their use a likely source of danger to many people. As purchasers of Defective Vehicles, California Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

867. California Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with California Plaintiffs.

868. California Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. California Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

869. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, from the federal class action complaint and directly from consumers, including California Plaintiffs

870. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

871. California Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to California Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, increased gasoline costs and various consequential damages including mental anguish damages. California Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**SECOND CAUSE OF ACTION –**
**VIOLATION OF THE CONSUMER LEGAL REMEDIES ACT ("CLRA")**
**(CAL. CIV. CODE § 1750, ET SEQ.)**

872. California Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

873. FCA is a "person" as that term is defined in California Civil Code § 1761(c). California Plaintiffs are "consumers" as that term is defined in California Civil Code §1761(d).

874. FCA engaged in unfair and deceptive acts in violation of the CLRA by the practices described above, and by knowingly and intentionally concealing from California Plaintiffs that the Defective Vehicles suffer from a defect(s) (and the costs, risks, and diminished value of the vehicles as a result of this problem).

875. FCA's acts and practices violated the CLRA by: (1) Representing that goods or services have sponsorships, characteristics, uses, benefits, or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation or connection which he or she does not have; (2) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; (3) Advertising goods and services with the intent not to sell them as advertised; and (4) Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

876. FCA's unfair or deceptive acts or practices occurred repeatedly in its trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

877. FCA knew that the Defective Batteries were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

878. FCA had a duty to California Plaintiffs to disclose the Defective Batteries and the defective nature of the Defective Vehicles because:

a. FCA was in a superior position to know the true state of facts about the defective vehicles and their defective batteries and had exclusive knowledge of the defects based on sources not available to consumers.

b. California Plaintiffs could not reasonably have been expected to learn or discover that the vehicles were defective or had defective batteries;

c. FCA actively concealed the defects at issue, which were material facts of which it had exclusive knowledge;

d. FCA knew that California Plaintiffs could not reasonably have been expected to learn about or discover that the vehicles were defective or had defective batteries;

e. The existence of the battery defects was a material fact, pertaining to vehicle safety, that a reasonable consumer would consider highly material in determining whether to purchase or lease the subject vehicles and at what price;

f. FCA made partial disclosures about the vehicles' range and the batteries' capabilities that were misleading without full disclosure of the battery defects.

879. FCA had direct dealings with the California Plaintiffs through its authorized dealers. California Plaintiffs had a transactional relationship with the FCA dealers and with FCA because they purchased the subject vehicles from FCA's authorized dealers, because FCA's dealers were FCA's authorized representatives for the service and repair of the subject vehicles, and because the vehicles came with implied warranties from FCA (described above) that were intended solely for the benefit of California Plaintiffs. California Plaintiffs' direct dealings, and

transactional relationship with, FCA are more fully set forth in paragraphs 343-358 above and incorporated by reference herein.

880. FCA's actions were fraudulent because they concealed from California Plaintiffs the battery defect, the true nature of the defective vehicles, the fact that fully charging the vehicles and using them to their reported maximum range would create an unreasonable risk of a vehicle fire. FCA concealed a serious safety issue that existed as a result of the defective batteries.

881. FCA's actions were also fraudulent because they represented that the subject vehicles could be safely charged indoors, could be safely parked indoors, could be charged overnight, could be fully charged without compromising their safety, could be safely used to the full limit of their reported range, and could be fully depleted during use without compromising their safety. FCA failed to inform California Plaintiffs that the subject vehicles could not be safely charged indoors, could not be safely parked indoors, could not be safely charged overnight, could not be fully charged without compromising their safety, could not be safely used to the full limit of their reported range, and could not be fully depleted during use without compromising their safety. In failing to disclose the Defective Battery with its safety risks and inefficiency, FCA knowingly and intentionally concealed material facts and breached their duty to disclose.

882. The facts FCA concealed or did not disclose to California Plaintiffs are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Defective Vehicles or pay a lesser price. Had California Plaintiffs known the Defective Vehicles were defective, they would not have purchased the Defective Vehicles or would have paid substantially less for them. Because they were unaware of the true nature of the

Defective Vehicles, the California Plaintiffs suffered overpayment damages at the time of purchase.

883. FCA intended that California Plaintiffs rely, and California Plaintiffs did rely, on FCA's false, misleading and deceptive acts and practices in purchasing the Subject Vehicles. Had California Plaintiffs been aware of the Subject Vehicles' serious battery defect or that the represented electric range was dependent on the battery being charged to an unsafe and dangerous level which could lead to a fire, they would not have purchased the Subject Vehicles or would have paid substantially less for them. By purchasing the Subject Vehicles at the prices they paid, California Plaintiffs suffered actual damages as a result of FCA's false, misleading and deceptive acts and practices, including but not limited to overpayment at the time of purchase, out of pocket repair costs and diminution in value of the subject vehicles. California Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

884. As a direct and proximate result of FCA's fraudulent and deceptive business practices, California Plaintiffs bought or leased Defective Vehicles they otherwise would not have, overpaid for their vehicles at the time of purchase, did not receive the benefit of their bargain, suffered incidental and consequential damages and suffered a diminution in value of their vehicles. California Plaintiffs' damages include overpayment at the time of lease or purchase, loss of vale of the subject vehicles, damages suffered due to the purchase, lease or rental of replacement vehicles, increased charging costs, the cost of gasoline for substitute vehicles, increased parking costs and other incidental and consequential damages. Moreover, many California Plaintiffs suffered from anxiety, mental anguish and emotional distress as a result of their vehicle's reduced range and their potential for spontaneous fires.

885. Pursuant to Cal. Civ. Code § 1780, California Plaintiffs seek actual damages, reasonable attorneys' fees and costs against FCA. As described above, each Plaintiff sent a pre-suit notice letter that complied with the requirements of Cal. CCP § 1782 more than 30 days before filing this lawsuit.

886. California Plaintiffs hereby sue FCA for their actual damages, including economic and non-economic damages (including, without limitation, damages for anxiety, mental anguish and emotional distress) as determined at trial plus costs of court and attorneys' fees. California Plaintiffs also seek punitive damages against FCA because FCA carried out their reprehensible conduct with willful and conscious disregard of the rights and safety of others, subjecting California Plaintiffs to potential unjust hardship as a result. FCA intentionally and willfully deceived California Plaintiffs regarding important safety issues and concealed material facts that only FCAs knew. FCA's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

**THIRD CAUSE OF ACTION-**
**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**(CAL. COM. CODE §§ 2314 AND 10212)**

887. California Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

888. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under California Commercial Code §§ 2104(1) and 10103(c), and "seller" of motor vehicles under § 2103(1)(d).

889. With respect to leases, FCA is and was at all relevant times relevant a "lessor" of motor vehicles under Cal. Com. Code § 10103(a)(16).

890. The Defective Vehicles are and were at all relevant times "goods" within the meaning of California Commercial Code §§ 2105(1) and 10103(a)(8).

891. FCA was at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Defective Vehicles. FCA knew or had reason to know of the specific use for which the Defective Vehicles were purchased.

892. A warranty that the Defective Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to California Commercial Code §§ 2314 and 10212.

893. FCA provided California Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, are merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Defective Vehicles would be fit for their intended use while being operated.

894. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage.

895. The Defective Vehicles were not fit for their ordinary purpose of operating as a hybrid electric vehicle. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of a fire. And a merchantable hybrid electric vehicle provides consistent and reliable electric-only and electric-assisted operation.

896. The Defects were of such a character that when the Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Vehicles were therefore a "thing of danger" that made their use a likely source of danger to many people. As purchasers of Defective Vehicles, California Plaintiffs are among the persons for whom use of the Defective Vehicles was contemplated by FCA. In summary, FCA breached the implied warranty of merchantability because of:

- The fire risk inherent in the defective batteries;
- The significantly reduced vehicle range caused by the defect;
- The significantly reduced eMPG caused by the defect;
- The inability of California Plaintiffs to use their vehicles in all-electric mode;
- The fact that California Plaintiffs could not park their vehicles indoors; and
- The fact that California Plaintiffs could not park their vehicles near other vehicles.

897. California Plaintiffs purchased their vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles and the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with California Plaintiffs.

898. California Plaintiffs each provided FCA notice and an opportunity to cure their breach within a reasonable time and/or were not required to do so because affording FCA a reasonable opportunity to cure their breaches would have been futile. As the ever-evolving recalls described above illustrate, FCA has not been able to satisfactorily address the battery defects in the subject vehicles. To this day, it has been unable to determine whether or not all of the batteries in the subject vehicles are prone to overheating when charged and, if not, to determine which batteries are susceptible to spontaneous ignition and which are not. Vehicles that have received FCA's software updates have nevertheless caught fire,

899. Rather than replace all of the batteries at issue, FCA has instead insisted on a series of halting and ineffective half-measures designed to reduce its repair and replacement costs rather than truly solve the problem. The software updates have failed to resolve the root cause of the battery defect and have forced California Plaintiffs to abandon the electric operation of their vehicles. Under these circumstances, California Plaintiffs have alleged enough to establish that it would have been futile to present their vehicles for repair.

900. In any event, FCA knew about the defect but chose to conceal it as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, and directly from consumers.

901. California Plaintiffs have had sufficient dealings with FCA or its authorized dealers to establish privity of contract. Privity is not required in this case, however, because California Plaintiffs are intended third-party beneficiaries of contracts between FCA and its authorized dealers and are intended beneficiaries of FCA's implied warranties. The dealers were

not intended to be the ultimate consumers of the Defective Vehicles, and the warranties were designed for and intended to benefit the ultimate consumers only.

902. As a direct and proximate result of the breach of said implied warranty, California Plaintiffs sustained the damages herein set forth. California Plaintiffs are, therefore, entitled to damages in an amount to be proven at the time of trial.

**FOURTH CAUSE OF ACTION-**
**VIOLATIONS OF THE SONG-BEVERLY ACT –**
**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**(CAL. CIV. CODE §§ 1792, 1791.1, ET SEQ.)**

903. California Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

904. California Plaintiffs acquired the Defective Vehicles in California; therefore, they are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

905. The Defective Vehicles are "consumer good[s]" within the meaning of Cal. Civ. Code § 1791(a).

906. FCA is a "manufacturer" and "distributor" of the Defective Vehicles within the meaning of Cal. Civ. Code § 1791(j).

907. At the time California Plaintiffs acquired their Defective Vehicles and all relevant times thereafter FCA warranted to undertake to preserve or maintain the utility or performance of said vehicles.

908. At the time of purchase, FCA was in the business of manufacturing, distributing and/or selling motor vehicles.

909. FCA impliedly warranted to California Plaintiffs that the Defective Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792; however, the Defective Vehicles do not have the quality that a buyer or lessee would reasonably expect.

910. Cal. Civ. Code § 1791.1(a) states: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

(1) Pass without objection in the trade under the contract description.

(2) Are fit for the ordinary purposes for which such goods are used.

(3) Are adequately contained, packaged, and labeled.

(4) Conform to the promises or affirmations of fact made on the container or label.

911. The Defective Vehicles would not pass without objection in the automotive trade and were and are not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Defective Battery can manifest and result in spontaneous ignition and fire when fully or nearly fully charged and are therefore not safe to operate. Moreover, the Defective Vehicles would not pass without objection in the automotive trade and were and are not fit for their ordinary purpose because they were marketed and sold as hybrid vehicles.

912. The Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, their eMPG and their use as electric-only vehicles. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the

time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage.

913. The Defective Vehicles were not fit for their ordinary purpose of operating as a hybrid electric vehicle. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of a fire. And a merchantable hybrid electric vehicle provides consistent and reliable electric-only and electric-assisted operation.

914. The Defects were of such a character that when the Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Vehicles were therefore a "thing of danger" that made their use a likely source of danger to many people. As purchasers of Defective Vehicles, California Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA. In summary, FCA breached the implied warranty of merchantability because of:

- The fire risk inherent in the defective batteries;
- The significantly reduced vehicle range caused by the defect;
- The significantly reduced eMPG caused by the defect;
- The inability of California Plaintiffs to use their vehicles in all-electric mode;
- The fact that California Plaintiffs could not park their vehicles indoors;
- The fact that California Plaintiffs could not park their vehicles near other vehicles.

915. FCA impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty

that the vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Defective Vehicles would be fit for their intended use as hybrid vehicles while being operated.

916. California Plaintiffs purchased their vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles and the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with California Plaintiffs. *See, e.g., In re Chevrolet Bolt EV Battery Litig.*, 633 F. Supp. 3d 921, 976 (E.D. Mich. 2022) ("California law recognizes a third-party beneficiary exception to the privity requirement, and courts have allowed implied warranty claims to proceed under California law where California Plaintiffs alleged that they purchased their vehicles from a network of authorized dealers, were the intended consumers, and that the dealers had no rights under the warranty agreements.").

917. As a direct and proximate result of FCA's breaches of the implied warranties of merchantability, California Plaintiffs received goods whose defective condition substantially impairs their value to California Plaintiffs. California Plaintiffs have been damaged as a result of the diminished value of FCA's products, the products' malfunctioning, and the nonuse of their Defective Vehicles

918. Pursuant to Cal. Civ. Code §§ 1791.1(d) & 1794, California Plaintiffs sue FCA for damages and other legal and equitable relief including, at their election, the purchase price of their Defective Vehicles, the overpayment at the time of purchase or the diminution in value of their Defective Vehicles. California Plaintiffs further sue FCA for civil penalties in amount to be determined at trial because of FCA's willful failure to comply with their obligations to California

Plaintiffs. Pursuant to Cal. Civ. Code § 1794, California Plaintiffs further sue FCA for costs and attorneys' fees.

**FIFTH CAUSE OF ACTION-**
**FRAUD**

919. California Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

920. California Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

921. FCA made material omissions regarding the Defective Vehicles and their batteries, actively concealed the Defective Batteries and made material statements of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA failed to disclose that the Defective Vehicles could only provide the promised 49 eMPG in all-electric mode, a mode which would render them unsafe and prone to fire. FCA also failed to disclose the existence of the Battery Defect. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

922. Knowledge and information regarding the vehicle's defects were in the exclusive and superior possession of FCA and were not provided to California Plaintiffs. California Plaintiffs were unaware of the battery defects and could not have discovered them through reasonably diligent investigation.

923. FCA had the duty to California Plaintiffs to disclose the defective batteries and the defective nature of the subject vehicles because:

a. FCA was in a superior position to know the material facts about the defective vehicles and their defective batteries and had exclusive knowledge of the defects

based on sources not available to consumer as described in paragraphs 300-317 above and incorporated by reference herein;

b. California Plaintiffs could not reasonably have been expected to learn or discover that the vehicles were defective or had defective batteries;

c. FCA actively concealed the defects at issue, which were material facts of which it had exclusive knowledge;

d. FCA knew that California Plaintiffs could not reasonably have been expected to learn about or discover that the vehicles were defective or had defective batteries;

e. The existence of the battery defects was a material fact, pertaining to vehicle safety, that a reasonable consumer would consider highly material in determining whether to purchase or lease the subject vehicles and at what price;

f. FCA made partial disclosures about the mileage, range, safety, and performance of the subject vehicles that were misleading without disclosure of the fact that the vehicle contained unsafe batteries that caused the vehicle to overheat and posed an unreasonable risk of fire; and

g. FCA made partial disclosures about the mileage, range, safety, and performance of the subject vehicles that were misleading without disclosure of the fact that the vehicles could be safely charged, thereby eliminating their use as hybrid electric vehicles.

924. Here, FCA voluntarily disclosed the all-electric range and eMPG of the subject vehicles in advertisements and other materials and yet did not disclose the whole truth by revealing that the advertised all-electric range and eMPG could only be reached by fully charging

the vehicles and subjecting the owners to an unreasonable risk of a battery-related fire or that the Battery Defect would prevent the Vehicles from operating safely or in all-electric mode.

925. Moreover, even if FCA's representations regarding the vehicle's electric range and eMPG were true when made, FCA's discovery of the Battery Defect made its earlier representations misleading or untrue. Finally, FCA's representations about the vehicle's electric range and eMPG were a partial disclosure that conveyed a false impression since the advertised range could only be achieved by subjecting California Plaintiffs' vehicles to an unreasonable risk of a battery-related fire and could not be achieved at all following FCA's recalls. Under these facts, FCA had a duty to disclose the Defects and the effects thereof.

926. In addition, FCA had a duty to disclose these omitted material facts because they were known and/or accessible only to FCA, which had superior knowledge and access to the facts, and FCA knew they were not known to or reasonably discoverable by California Plaintiffs. The facts FCA omitted from its representations were material because they directly impacted the Subject Vehicles' safety and reliability.

927. FCA also had a duty to disclose because it was in exclusive control of the material facts and such facts were not known to the public or the California Plaintiffs. FCA possessed exclusive knowledge of the Battery Defect.

928. FCA also had a duty to disclose because it actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce California Plaintiffs to purchase the Subject Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

929. California Plaintiffs were unaware of the omitted and concealed material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The

actions of California Plaintiffs were justified and California Plaintiffs reasonably relied on FCA's omissions and suffered damages as a result.

930. As a result of FCA's omissions and concealments, California Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of purchase, out of pocket costs, and various consequential damages including mental anguish damages.

931. California Plaintiffs had direct dealings with the FCA's dealers and with FCA through its authorized dealers. California Plaintiffs had a transactional relationship with FCA's dealers and with FCA because they purchased the subject vehicles from FCA's authorized dealers, because FCA's dealers were FCA's authorized representatives for the sale, maintenance and service of the subject vehicles, and because the vehicles came with implied warranties from FCA that were intended solely for the benefit of California Plaintiffs.

932. FCA's actions were fraudulent because they concealed from California Plaintiffs the battery defect, the true nature of the defective vehicles, the fact that fully charging the vehicles and using them to their reported maximum range would create an unreasonable risk of a vehicle fire. FCA concealed a serious safety issue that existed as a result of the defective batteries

933. FCA's actions were also fraudulent because they represented that the subject vehicles could be safely charged indoors, could be safely parked indoors, could be charged overnight, could be fully charged without compromising their safety, could be safely used to the full limit of their reported range, and could be safely operated as hybrid electric vehicles.

934. FCA's concealment of the true characteristics of the subject vehicles and their batteries were material to California Plaintiffs, and FCA concealed and or failed to disclose the

truth with the intention that California Plaintiffs would rely on FCA's concealments and omissions in deciding to lease or purchase the subject vehicles. California Plaintiffs reasonably and detrimentally relied on FCA's concealments and omissions in deciding to purchase or lease the subject vehicles. Had they known the truth, California Plaintiffs would not have purchased or leased the subject vehicles or would have paid far less for them.

935. FCA intended that California Plaintiffs rely, and California Plaintiffs did rely, on FCA's false, misleading and deceptive acts and practices in purchasing the Subject Vehicles. Had California Plaintiffs been aware of the Subject Vehicles' serious battery defect or that the represented electric range was dependent on the battery being fully charged to an unsafe and dangerous level which could lead to a fire, they would not have purchased the Subject Vehicles or would have paid substantially less for them. By purchasing the Subject Vehicles at the prices they paid, California Plaintiffs suffered actual damages as a result of FCA's false, misleading and deceptive acts and practices, including but not limited to overpayment at the time of purchase, out of pocket repair costs and diminution in value of the subject vehicles. California Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

936. California Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of FCA's fraud. Such damages include overpayment at the time of lease or purchase, loss of value of the subject vehicles, damages suffered due to the purchase, lease or rental of replacement vehicles, increased charging costs, the cost of gasoline for substitute vehicles, increased parking costs and other incidental and consequential damages. Moreover, California Plaintiffs suffered from anxiety, mental anguish and emotional distress as a result of their vehicle's reduced range and their potential for spontaneous fires.

937. California Plaintiffs hereby sue FCA their actual damages, including economic and non-economic damages (including, without limitation, damages for anxiety, mental anguish and emotional distress) as determined at trial plus costs of court and attorneys' fees. California Plaintiffs also seek punitive damages against FCA because FCA carried out its reprehensible conduct with willful and conscious disregard of the rights and safety of others, subjecting California Plaintiffs to potential unjust hardship as a result. FCA intentionally and willfully deceived California Plaintiffs regarding important safety issues and concealed material facts that only FCA knew. FCA's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

**SIXTH CAUSE OF ACION-**
**VIOLATIONS OF UCL (BUS. & PROF. CODE § 17200)**

938. California Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

939. California Plaintiffs have complied with all applicable, pre-suit notice letter provisions, if any.

940. California's Unfair Competition Law ("UCL"), Business and Professions Code § 17200, prohibits any "unlawful, unfair, or fraudulent business act or practices."

941. FCA's actions were unlawful because they violated the Song-Beverly Consumer Warranty Act and the Consumer Legal Remedies Act among other laws.

942. FCA's actions were unfair because they violated California's public policy, including that legislatively declared in the Song-Beverly Consumer Warranty Act, which requires a manufacturer to ensure that goods it places on the market are fit for their ordinary and intended purpose, which the Bolt vehicles were not. FCA's actions were also unfair because they caused an injury to California Plaintiffs that outweighed any benefits provided to consumers

and such injury was one that consumers could not reasonably avoid." *Camacho v. Auto Club of Southern California*, 142 Cal. App. 4th 1394, 1403 (2006). FCA's use of a defective battery in the subject vehicles did not confer any benefit to Plaintiff and caused injuries to consumers, like California Plaintiffs, who could not use their vehicles commensurate with their reasonable expectations regarding charging, parking and range. FCA's actions of using a defective battery in the subject vehicles caused injuries to California Plaintiffs, who ended up overpaying for the vehicles, received a quality of vehicle less than what they expected to receive and suffered a loss in value of the vehicles after the defects became known. California Plaintiffs could not avoid any of the injuries caused by the defective batteries in their vehicles.

943. FCA's actions were fraudulent because they concealed from California Plaintiffs the battery defect, the true nature of the defective vehicles, the fact that fully charging the vehicles and using them to their reported maximum range would create an unreasonable risk of a vehicle fire. FCA concealed a serious safety issue that existed as a result of the defective batteries. FCA failed to inform California Plaintiffs that the subject vehicles could not be safely charged, could not be safely parked indoors, could not be charged without compromising their safety, could not be safely used to the full limit of their reported range, and could not safely operate as hybrid electric vehicles.

944. FCA intended that California Plaintiffs rely, and California Plaintiffs did rely, on FCA's false, misleading and deceptive acts and practices in purchasing the Subject Vehicles. Had California Plaintiffs been aware of the Subject Vehicles' serious battery defect or that the represented electric range was dependent on the battery being charged to an unsafe and dangerous level which could lead to a fire, they would not have purchased the Subject Vehicles or would have paid substantially less for them. By purchasing the Subject Vehicles at the prices

they paid, California Plaintiffs suffered actual damages as a result of FCA's false, misleading and deceptive acts and practices, including but not limited to overpayment at the time of purchase, out of pocket repair costs and diminution in value of the subject vehicles.

945. FCA's concealment of the true characteristics of the subject vehicle and their batteries were material to California Plaintiffs, and FCA concealed and or failed to disclose the truth with the intention that consumers would rely on FCA's concealments, and omissions. Had they known the truth, California Plaintiffs would not have purchased or leased the subject vehicles or would have paid far less for them.

946. FCA knew or should have known of its unlawful conduct.

947. As alleged in the preceding paragraphs, the misrepresentations and omissions by FCA detailed above constitute an unlawful business practice within the meaning of California Business and Professions Code Section 17200.

948. There were reasonably available alternatives to further FCA's legitimate business interests, other than the conduct alleged herein. FCA's could have used a battery appropriate for the quality and safety of the vehicle.

949. All of the conduct alleged herein occurred and continues to occur in FCA's business. FCA's unlawful conduct is part of a pattern or generalized course of conduct repeated daily.

950. California Plaintiffs have suffered injury in fact and have lost money as a result of FCA's unlawful conduct. California Plaintiffs paid an unwarranted premium for this vehicle that was unfit for normal use.

951. As a result of the business acts and practices described above, California Plaintiffs, pursuant to § 17203, are entitled to an order enjoining such future wrongful conduct

on the part of FCA and such other orders and judgments that may be necessary to disgorge FCA's ill-gotten gains and to restore to any person in interest any money paid for the vehicle as a result of the wrongful conduct of FCA.

952. Pursuant to Civil Code § 3287(a), California Plaintiffs are entitled to pre-judgment interest as a direct and proximate result of FCA's unfair and fraudulent business conduct. The amount on which interest is to be calculated is a sum certain and capable of calculation, and California Plaintiffs are entitled to interest in an amount according to proof.

953. California Plaintiffs have suffered ascertainable loss and actual damages as a direct and proximate result of FCA's misrepresentations and FCA's concealment of and failure to disclose material information. Pursuant to Cal. Bus. & Prof. Code § 17200, California Plaintiffs seek an order enjoining FCA's unfair and/or deceptive acts or practices, any such orders or judgments as may be necessary to restore to California Plaintiffs any money acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code §§ 17203 and 3345, and any other just and proper relief available under the California UCL. California Plaintiffs also seek an award of attorneys' fees under Cal. Code Civ. Proc. § 1021.5.

954. California Plaintiffs plead this claim separately as well as in the alternative to their other claims, including their CLRA claims, as without this UCL claim they would have no adequate legal remedy.

**SEVENTH CAUSE OF ACTION-**
**UNJUST ENRICHMENT**

955. California Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

956. FCA is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the Battery Defect and FORM Defect in the Defective Vehicles, but nevertheless marketed them for sale to consumers, and misled Maryland Plaintiffs regarding the nature and quality of the Defective Vehicles while profiting from this deception.

957. FCA failed to adequately research, design, test, and manufacture the Defective Vehicles before warranting, promoting, selling and distributing the Defective Vehicles as suitable and safe for reasonably foreseeable uses.

958. At the expense of California Plaintiffs, FCA received and retained a benefit from Plaintiffs and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Defective Vehicles to California Plaintiffs and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Defective Vehicles to California Plaintiffs for more than they were worth as a result of FCA's conduct.

959. California Plaintiffs would not have purchased or leased the Defective Vehicles, or would have paid less for them, had they known of the Battery Defect or FORM Defect at the time of purchase or lease. Therefore, FCA profited from the sale and lease of the Defective Vehicles to the detriment and expense of California Plaintiffs.

960. California Plaintiffs conferred tangible and material economic benefits upon FCA when they purchased or leased the Defective Vehicles.

961. FCA knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of FCA acting in its pecuniary interest at the expense of its customers. It is inequitable, unconscionable, and unjust for FCA to retain these benefits.

962. As a licensed distributor of new motor vehicles, FCA sold the Defective Vehicles to California Plaintiffs through its network of authorized dealers across the United States. FCA profited from the sale of the Defective Vehicles, including sales made through its dealership network and sales brokered through its financing and leasing arms. FCA also benefitted from the sale of the Defective Vehicles as a result of the resulting service and warranty work performed on the Defective Vehicles.

963. California Plaintiffs were not aware of the true facts about the Defective Vehicles when they acquired them and did not benefit from FCA's conduct.

964. There is no justification for FCA's unjust enrichment. It would be inequitable, unconscionable, and unjust for FCA to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

965. California Plaintiffs are entitled to restitution of the benefits FCA unjustly retained and/or any amounts necessary to return California Plaintiffs to the position they occupied prior to dealing with FCA.

966. California Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

## MICHIGAN CAUSES OF ACTION

### FIRST CAUSE OF ACTION - BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301, ET SEQ. (THE "MMWA")

967. Michigan Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

968. Michigan Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

969. Michigan Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). FCA is a supplier and warrantor within the meaning of 15 U.S.C. §§ 2301(4)-(5). Michigan Plaintiffs' Vehicles are a "consumer product" within the meaning of 15 U.S.C. § 2301(1).

970. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Michigan at MCL 440.2105.

971. FCA is and was at all relevant times a "merchant" with respect to motor vehicles within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Michigan at MCL 440.2104.

972. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Michigan at MCL 4401.2314.

973. FCA provided Michigan Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

974. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate.

In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage. The FORM Defect interfered with the acceleration and all-electric operation of the Vehicles.

975. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

976. The Defects were of such a character that when the Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Vehicles were therefore a "thing of danger" that made their use a likely source of danger to many people. As purchasers of Defective Vehicles, Michigan Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

977. Michigan Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with Michigan Plaintiffs.

978. Michigan Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. Michigan

Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

979. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, from the federal class action complaint and directly from consumers, including Michigan Plaintiffs

980. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

981. Michigan Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to Michigan Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, increased gasoline costs and various consequential damages including mental anguish damages. Michigan Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**SECOND CAUSE OF ACTION –**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

982. Michigan Plaintiffs incorporate by reference each preceding paragraph as if fully set forth herein.

983. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Michigan at MCL 440.2105.

984. FCA is and was at all relevant times a "merchant" with respect to motor vehicles within the meaning of Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Michigan at MCL 440.2104.

985. A warranty that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Article 2 of the Uniform Commercial Code ("UCC"), as adopted by Michigan at MCL 4401.2314.

986. FCA provided Michigan Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, were merchantable and fit for the ordinary purposes for which they were sold. FCA impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Vehicles would be fit for its intended use while being operated, charged, stored or parked.

987. The Defective Vehicles were not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Battery Defect can manifest and result in spontaneous ignition and fire and is therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of the Defective Vehicles severely compromised their range, utility, performance and effective gas mileage. The FORM Defect interfered with the all-acceleration and all-electric operation of the Vehicles.

988. A merchantable hybrid electric vehicle can be safely parked and charged inside a garage without the risk of fire. A merchantable hybrid electric vehicle can be safely charged to

its full capacity without the risk of fire. A merchantable hybrid electric vehicle can be safely used without risk of an underhood fire. And a merchantable hybrid electric vehicle provides consistent and reliable electric-only and electric-assisted operation in all foreseeable operating environments. The Defective Vehicles had none of these attributes.

989. The Defects were of such a character that when the Defective Vehicles were used for the purpose for which they were intended they were likely to be a source of danger to purchasers and others if not properly designed and fashioned. The Defective Vehicles were therefore a "thing of danger" that made their use a likely source of danger to many people. As purchasers of Defective Vehicles, Michigan Plaintiffs are among the persons for whom use of the Defective Vehicles were contemplated by FCA.

990. Michigan Plaintiffs acquired the Vehicles from a network of authorized FCA dealers, were the intended consumers of the Defective Vehicles the dealers had no rights under the warranty agreements. As such, FCA is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with Michigan Plaintiffs.

991. Michigan Plaintiffs provided FCA with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. Michigan Plaintiffs notified FCA of its breach within a reasonable time, and/or were not required to do so because affording FCA a reasonable opportunity to cure its breaches would have been futile.

992. In any event, FCA knew about the defects but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, FCA was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources,

from the federal class action complaint and directly from consumers, including Michigan Plaintiffs

993. FCA failed to adequately remedy the defects in the subject Vehicles within a reasonable time.

994. Michigan Plaintiffs are entitled to relief because FCA's breach of the implied warranty of merchantability was a producing cause of economic damages to Michigan Plaintiffs in the form of overpayment at the time of purchase, out of pocket costs, loss of use of their vehicles, increased gasoline costs and various consequential damages including mental anguish damages. Michigan Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**THIRD CAUSE OF ACTION -**
**FRAUDULENT CONCEALMENT/FRAUD BY OMISSION**

995. Michigan Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

996. FCA made material omissions regarding the Defective Vehicles and their batteries, actively concealed the Defective Batteries and made material statements of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA failed to disclose that the Defective Vehicles could only provide the promised 49 eMPG in all-electric mode, a mode which would render them unsafe and prone to fire. FCA also failed to disclose the existence of the Battery Defect and the FORM Defect. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

997. Under Michigan law, a defendant has a duty to disclose under the following circumstances: (a) where a person voluntarily discloses information, the whole truth must be

disclosed; (b) when a person makes a representation and new information makes that earlier misrepresentation misleading or untrue; and (c) when a person makes a partial disclosure and conveys a false impression. Here, FCA voluntarily disclosed the all-electric range and eMPG of the subject vehicles in advertisements and other materials and yet did not disclose the whole truth by revealing that the advertised all-electric range and eMPG could only be reached by fully charging the vehicles and subjecting the owners to an unreasonable risk of a battery-related fire or that the FORM Defect would prevent the Vehicles from operating safely or in all-electric mode.

998. Moreover, even if FCA's representations regarding the vehicle's electric range and eMPG were true when made, FCA's discovery of the Battery Defect and FORM Defect made its earlier representations misleading or untrue. Finally, FCA's representations about the vehicle's electric range and eMPG were a partial disclosure that conveyed a false impression since the advertised range could only be achieved by subjecting Michigan Plaintiffs' vehicles to an unreasonable risk of a battery-related fire and could often not be achieved at all as a result of the FORM Defect. Under these facts, FCA had a duty to disclose the Defects and the effects thereof.

999. In addition, FCA had a duty to disclose these omitted material facts because they were known and/or accessible only to FCA, which had superior knowledge and access to the facts, and FCA knew they were not known to or reasonably discoverable by Michigan Plaintiffs. The facts FCA omitted from its representations were material because they directly impacted the Subject Vehicles' safety and reliability.

1000. FCA also had a duty to disclose because it was in exclusive control of the material facts and such facts were not known to the public or the Michigan Plaintiffs. FCA possessed exclusive knowledge of the Battery Defect and FORM Defect.

1001. FCA also had a duty to disclose because it actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Michigan Plaintiffs to purchase the Subject Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

1002. Michigan Plaintiffs were unaware of the omitted and concealed material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of Michigan Plaintiffs were justified and Michigan Plaintiffs reasonably relied on FCA's omissions and suffered damages as a result.

1003. As a result of FCA's omissions and concealments, Michigan Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of purchase, out of pocket costs, and various consequential damages including mental anguish damages.

1004. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Michigan Plaintiffs. FCA's' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**FOURTH CAUSE OF ACTION -**
**FRAUD BY AFFIRMATIVE MISREPRESENTATION**

1005. Michigan Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

1006. FCA made material misrepresentations regarding the Defective Vehicles and their batteries, actively concealed the Battery Defect and FORM Defect and made material statements of fact that were misleading without disclosure of the true facts regarding the Defective Vehicles and their batteries. Among other things, FCA falsely represented the electric range and eMPG of

the Defective Vehicles. FCA also misrepresented the utility of the Defective Vehicles in cold weather.

1007. Michigan Plaintiffs reasonably relied on FCA's misrepresentations and suffered damages as a result. As a result of FCA's fraud, Michigan Plaintiffs incurred damages including, but not limited to, the lost benefit of the bargain, overpayment at the time of purchase, out of pocket costs, and various consequential damages including mental anguish damages.

1008. FCA's acts of fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Michigan Plaintiffs. FCA's' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**FIFTH CAUSE OF ACTION-**
**VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT**
**MCLA § 445.901 ET. SEQ.)**

1009. Michigan Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

1010. The Michigan Plaintiffs are "person[s]" within the meaning of the MICH. COMP. LAWS § 445.902(1)(d).

1011. FCA is a "person" engaged in "trade or commerce" within the meaning of the MICH. COMP. LAWS § 445.902(1)(d) and (g).

1012.

1013. In the course of doing business, FCA misrepresented material facts concerning the Subject Vehicles, including their all-electric range and eMPG. In the course of doing business, FCA also knowingly failed to disclose, suppressed, concealed, suppressed and/or omitted material facts regarding the Battery Defect and FORM Defect and the safety hazards associated with them,

and misrepresented the standard, quality or grade of the Subject Vehicles, which directly caused harm to Michigan Plaintiffs. Moreover, FCA actively suppressed the fact that the batteries were defective and presented a safety hazard because of materials, workmanship and/or manufacturing defects. Instead of admitting the fundamental defect with the batteries, FCA rolled out a series of ineffective software updates in an attempt to conceal the extent of the Battery Defect and avoid the cost of battery replacements in the Defective Vehicles.

1014. FCA thus violated the Michigan CPA by, at minimum by: (1) representing that the Subject Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Subject Vehicles are of a particular standard and quality when they are not; (3) advertising the Subject Vehicles with the intent not to sell them as advertised; (4) willfully using, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact; (5) willfully failing to state a material fact, or the willfully concealing, suppressing or omitting a material fact; and (6) otherwise engaging in an unconscionable act or practice in connection with a consumer transaction.

1015. FCA knowingly and intentionally misrepresented and omitted material facts regarding the Subject Vehicles, intending for Michigan Plaintiffs to rely on these material misrepresentations and omissions when choosing to purchase or lease a Subject Vehicle instead of vehicles marketed and sold by its competitors.

1016. Michigan Plaintiffs relied on these material misrepresentations and, as a result, are entitled to damages in an amount to be proven at trial.

1017. FCA had a duty to Michigan Plaintiffs to disclose the Battery Defect and FORM Defect and the defective nature of the Subject Vehicles because:

a. FCA possessed exclusive knowledge that it was manufacturing, selling, and distributing vehicles throughout the United States that contained the defects;

b. Michigan Plaintiffs could not reasonably have been expected to learn or discover that the Subject Vehicles had these defects;

c. FCA knew that Michigan Plaintiffs could not reasonably have been expected to learn about or discover the defects on their own.

1018. In failing to disclose the defects and their resulting safety risks and efficiency decreases, FCA has knowingly and intentionally concealed and omitted material facts and breached its duty to disclose.

1019. The facts FCA concealed or did not disclose to Michigan Plaintiffs are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Subject Vehicles or pay a lesser price. Had Michigan Plaintiffs known the Subject Vehicles were defective, they would not have purchased the Subject Vehicles or would have paid less for them.

1020. FCA's violations present a continuing risk to Michigan Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

1021. The recalls and modifications FCA has instituted to address the defects have not been adequate to address or remedy the defects.

1022. Michigan Plaintiffs suffered ascertainable loss directly and proximately resulting from FCA's Michigan CPA violations. Michigan Plaintiffs have suffered actual damages and/or injury in fact, including, inter alia, the difference in value between the Subject Vehicles promised and warranted, and the Subject Vehicles as sold.

1023. As a direct and proximate result of FCA's unfair or deceptive acts or practices, the Michigan Plaintiffs have suffered and will continue to suffer actual damages, including economic damages at the point of sale or lease and/or diminished value of their Vehicles. Had the Michigan Plaintiffs known that the Vehicles would be plagued by the Defects, they would not have purchased or leased the Vehicles or would have paid substantially less to purchase or lease them.

1024. Michigan Plaintiffs seek monetary relief against JLI measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for each plaintiff; reasonable attorneys' fees and costs; and any other just and proper relief available under MICH. COMP. LAWS § 445.911.

**SIXTH CAUSE OF ACTION-**
**UNJUST ENRICHMENT**

1025. Michigan Plaintiffs incorporate by reference each of the preceding paragraphs as though fully set forth herein.

1026. FCA is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the Battery Defect and FORM Defect in the Defective Vehicles, but nevertheless marketed them for sale to consumers, and misled Michigan Plaintiffs regarding the nature and quality of the Defective Vehicles while profiting from this deception.

1027. FCA failed to adequately research, design, test, and manufacture the Defective Vehicles before warranting, promoting, selling and distributing the Defective Vehicles as suitable and safe for reasonably foreseeable uses.

1028. At the expense of Michigan Plaintiffs, FCA received and retained a benefit from Plaintiffs and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Defective Vehicles to Michigan Plaintiffs and inequity has resulted. FCA benefitted from selling,

leasing, and distributing the Defective Vehicles to Michigan Plaintiffs for more than they were worth as a result of FCA's conduct.

1029. Michigan Plaintiffs would not have purchased or leased the Defective Vehicles, or would have paid less for them, had they known of the Battery Defect or FORM Defect at the time of purchase or lease. Therefore, FCA profited from the sale and lease of the Defective Vehicles to the detriment and expense of Michigan Plaintiffs.

1030. Michigan Plaintiffs conferred tangible and material economic benefits upon FCA when they purchased or leased the Defective Vehicles.

1031. FCA knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of FCA acting in its pecuniary interest at the expense of its customers. It is inequitable, unconscionable, and unjust for FCA to retain these benefits.

1032. As a licensed distributor of new motor vehicles, FCA sold the Defective Vehicles to Michigan Plaintiffs through its network of authorized dealers across the United States. FCA profited from the sale of the Defective Vehicles, including sales made through its dealership network and sales brokered through its financing and leasing arms. FCA also benefitted from the sale of the Defective Vehicles as a result of the resulting service and warranty work performed on the Defective Vehicles.

1033. Michigan Plaintiffs were not aware of the true facts about the Defective Vehicles when they acquired them and did not benefit from FCA's conduct.

1034. There is no justification for FCA's unjust enrichment. It would be inequitable, unconscionable, and unjust for FCA to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

1035. Michigan Plaintiffs are entitled to restitution of the benefits FCA unjustly retained and/or any amounts necessary to return Michigan Plaintiffs to the position they occupied prior to dealing with FCA.

1036. Michigan Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

## LIMITATIONS

## PLAINTIFFS' CLAIMS ARE TIMELY UNDER LAW OR EQUITY

### Class Action Tolling

1037. Plaintiffs gave timely notice of his claims against FCA in the present action as a putative class member in the following class actions (the "Class Actions"):

- *Crowell v. FCA US, LLC*, United States District Court, District of Delaware, Case No. 1:23-cv-00013-MN, which was filed on January 5, 2023;
- *Frisch v. FCA US, LLC*, United States District Court, Eastern District of Michigan, Case No. 2:24-cv-10546-BRM, which was filed on March 4, 2024; and
- *Aiello v. FCA US, LLC*, United States District Court, Eastern District of Michigan, Case No. 2:26-cv-11365-BRM, which was filed on April 24, 2026.

1038. There is no prejudice to FCA in gathering evidence to defend against Plaintiffs' individual claims because the class definition in the Class Action complaints within which Plaintiffs are putative class members and the allegations in the class action lawsuit put FCA on notice of the facts that give rise to Plaintiffs' individual actions, the witnesses necessary for FCA to defend Plaintiffs' individual actions, and the causes of action against FCA asserted in Plaintiffs' individual action.

1039. The Class Plaintiffs alleged the same material facts on behalf of Plaintiffs as putative class members as are being alleged by Plaintiffs in the present individual action.

1040. The facts alleged in the Class Actions are substantially similar, if not identical to the facts alleged herein.

1041. The allegations in the Class Actions are based on the same subject matter and similar evidence as the instant complaint. Those allegations concern the same evidence, memories, and witnesses as the subject matter in the instant complaint.

1042. The Class Actions protected the efficiency and economy of litigation because that class action is protecting the rights of thousands of consumers nationwide through a single action. Consumer class actions regarding defective vehicles brought against manufacturers are regularly certified, making a class action lawsuit an efficient means of pursuing such claims.

1043. The tolling of Plaintiffs' individual statute of limitations encourages the protection of efficiency and economy in litigation as promoted by the class action device, so that putative class members would not find it necessary to seek to intervene or to join individually because of fear the class might never be certified or putative class members may subsequently seek to request exclusion.

1044. The running of all statute of limitations on Plaintiffs' claims asserted against FCA in the present action were therefore tolled by *American-Pipe* tolling during the entire pendency of the Class Actions.

**The Discovery Rule**

1045. The tolling doctrine was made for cases of concealment like this one. For the following reasons, any otherwise-applicable statutes of limitation have been tolled by the discovery rule with respect to all claims.

1046. Through the exercise of reasonable diligence, and within any applicable statutes of limitation, Plaintiffs could not have discovered that FCA was concealing and misrepresenting the true properties and capabilities of their Vehicles.

1047. Plaintiff could not have reasonably discovered, and did not know of facts that would have caused a reasonable person to suspect that FCA had intentionally failed to disclose the existence and effect of the Defective Batteries and defective FORMs.

1048. Likewise, a reasonable and diligent investigation could not have disclosed that FCA had information in its possession about the existence of the Defective Batteries and FORM Defect and that they concealed that information.

**Fraudulent Concealment**

1049. Throughout the relevant time period, all applicable statutes of limitation have been tolled by FCA's knowing and active fraudulent concealment and denial of the facts alleged in this Complaint.

1050. Well before the date of this Complaint, FCA knew of the existence of the Defective Batteries and FORM Defect, but continued to distribute, sell, and/or lease the Defective Vehicles. In doing so, FCA concealed and expressly denied the existence of the Defective Batteries and FORM Defect and/or failed to notify Plaintiff and others about the true nature of the Defective Vehicles.

1051. Instead of disclosing its deception and the existence of the Defective Batteries and FORM Defect, FCA falsely represented that its vehicles were safe and reliable and fit for their ordinary purpose.

**Estoppel**

1052. FCA had a continuous and on-going duty to tell the truth about the Defective Vehicles and to disclose to consumers including Plaintiff the facts that they knew about the Defective Batteries and FORM Defect.

1053. Although FCA had the duty throughout the relevant period to disclose to Plaintiffs the existence of the Defective Batteries, FORM Defect and Defective Vehicles, FCA chose to intentionally misrepresent and conceal the existence of these defects and the fact that the Defective Vehicles were unfit for their ordinary purpose.

1054. FCA actively concealed the true character, quality, performance, and nature of the Defective Vehicles, Defective Batteries and FORM Defect. Plaintiffs reasonably relied upon FCA's knowing and active concealment of these facts. Thus, FCA is estopped from relying on any statutes of limitations in defense of this action.

**ARBITRATION**

1055. In similar litigation, FCA has alleged that claims such as the instant case are subject to arbitration based on arbitration language in a warranty booklet. Plaintiffs assert that they are not bound by this provision because they never agreed to it and because:

- There was no mutual assent to the arbitration provision;
- FCA never adequately conveyed to Plaintiffs an offer to arbitrate;
- Plaintiffs had no notice of the arbitration provision;
- The arbitration provision was neither disclosed nor discussed during the transactions in which Plaintiffs obtained their vehicles;
- Plaintiffs did not receive the warranty booklet containing the arbitration provision during the transactions in which Plaintiffs obtained their vehicles;

- Plaintiffs did not receive the warranty booklet containing the arbitration provision when they took possession of their vehicles;
- Plaintiffs never signed an "Agreement to Arbitrate," which was a condition precedent to the formation of any arbitration agreement;
- Plaintiffs never signed an "Arbitration Acknowledgment Form," which was a condition precedent to the formation of any arbitration agreement;
- Plaintiffs timely and validly opted out of the alleged arbitration provision by letter to FCA dated July 7, 2026.

1056. In similar litigation, FCA has alleged that claims such as the instant case are subject to arbitration based on arbitration language in agreements between consumers and the dealers from whom they leased or purchased their vehicles. Plaintiffs assert that FCA, as a non-party to any such agreement, cannot enforce it against Plaintiffs.

## ATTORNEYS' FEES

1057. Plaintiffs seek all reasonable and necessary attorneys' fees in this case, which include the following:

a. preparation and trial of this lawsuit;

b. post-trial, pre-appeal legal services; and

c. an appeal to the Sixth Circuit Court of Appeals.

## CONDITIONS PRECEDENT

1058. All notices and other conditions precedent to Plaintiffs' rights to recover herein have been performed, have occurred or have been excused.

## JURY DEMAND

1059. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs request a jury trial of this matter and tenders the proper jury fee with the filing of this Complaint.

## CONCLUSION AND PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs respectfully prays that FCA be cited to appear and answer herein, and that upon final trial, they recover their actual damages, consequential damages, additional statutory damages, exemplary damages, attorney's fees, costs of court, pre-judgment and post-judgment interest at the highest legal rates, and such other and further relief, both general and special, at law or in equity, to which they may be justly entitled.

/s/ *Antranig Garibian*
Antranig Garibian, Esquire (Bar No. 4962)
**GARIBIAN LAW OFFICES, P.C.**
Brandywine Plaza East
1523 Concord Pike, Suite 400
Wilmington, DE 19803
Tel. (302) 722-6885
Email: ag@garibianlaw.com

Eric D. Pearson
Texas State Bar No. 15690472
eric@hop-law.com
Charles E. Miller
Texas State Bar No. 276523
charles@hop-law.com
**HEYGOOD, ORR & PEARSON**
6363 N. State Highway 161, Suite 450
Irving, Texas 75038

**ATTORNEYS FOR PLAINTIFFS**